# COMMUNITY TELEVISION OF SOUTHERN CALIFORNIA *v.* GOTTFRIED ET AL.

No. 81–298.   Argued October 12, 1982—Decided February 22, 1983*

---

*Together with No. 81–799, *Federal Communications Commission* v. *Gottfried et al.*, also on certiorari to the same court.

STEVENS, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, BLACKMUN, POWELL, REHNQUIST, and O'CONNOR, JJ., joined. MARSHALL, J., filed a dissenting opinion, in which BRENNAN, J., joined, *post*, p. 513.

*Edgar F. Czarra, Jr.*, argued the cause for petitioner in No. 81–298. With him on the briefs were *Mark D. Nozette* and *Richard A. Meserve*. *Samuel A. Alito, Jr.*, argued the cause for petitioner in No. 81–799. With him on the briefs were *Solicitor General Lee, Deputy Solicitor General Shapiro, Stephen A. Sharp*, and *C. Grey Pash, Jr.*

*Charles M. Firestone* argued the cause for respondents Gottfried et al. in both cases. With him on the brief were *Abraham Gottfried* and *Stanley Fleishman*. *J. Roger Wollenberg, Timothy B. Dyk, Ralph E. Goldberg*, and *Eleanor S. Applewhaite* filed a brief for CBS Inc., respondent under this Court's Rule 19.6.†

---

†*Harry R. Sheppard* filed a brief for Deaf Counseling, Advocacy and Referral Agency, Inc., et al. as *amici curiae* urging affirmance.

Justice Stevens delivered the opinion of the Court.

The question presented is whether § 504 of the Rehabilitation Act of 1973[1] requires the Federal Communications Commission to review a public television station's license renewal application under a different standard than it applies to a commercial licensee's renewal application. Contrary to the holding of the Court of Appeals for the District of Columbia Circuit, 210 U. S. App. D. C. 184, 655 F. 2d 297 (1981), we conclude that it does not.

I

On October 28, 1977, respondent Sue Gottfried filed a formal petition with the Federal Communications Commission requesting it to deny renewal of the television license of station KCET-TV in Los Angeles. She advanced two principal grounds for denial: First, that the licensee had failed to discharge its obligation to ascertain the problems, needs, and interests of the deaf and hearing-impaired population within its service area; and second, that the licensee had

---

[1] Section 504 of the Rehabilitation Act of 1973, 87 Stat. 394, as amended, and as set forth in 29 U. S. C. § 794 (1976 ed., Supp. V), provides:

"§ 794. Nondiscrimination under Federal grants and programs; promulgation of rules and regulations

"No otherwise qualified handicapped individual in the United States, as defined in section 706(7) of this title, shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service. The head of each such agency shall promulgate such regulations as may be necessary to carry out the amendments to this section made by the Rehabilitation, Comprehensive Services, and Developmental Disabilities Act of 1978. Copies of any proposed regulation shall be submitted to appropriate authorizing committees of the Congress, and such regulation may take effect no earlier than the thirtieth day after the date on which such regulation is so submitted to such committees."

violated, and remained in violation of, § 504 of the Rehabilitation Act.[2]

Correspondence attached to Gottfried's petition included complaints about KCET–TV's failure to carry enough programming with special captioning[3] or other aids to benefit the hearing-impaired members of the audience. The exhibits emphasized the station's failure to broadcast the ABC evening news in captioned form prior to May 23, 1977, and its subsequent failure to broadcast the captioned program during prime time.

In a verified opposition to the petition, the licensee recounted in some detail its efforts to ascertain the problems of the community it served, including the deaf and the hearing impaired, by a community leader survey and by a general public survey. App. in No. 79–1722 (CADC), pp. 102–105. The licensee also described its programming efforts to respond to the special needs of the hearing impaired,[4] and

---

[2] In her petition, Gottfried alleged, in part:

"That the Licensee has violated, and remains in violation of Section 504 of the Rehabilitation Act of 1973, and the regulations promulgated thereunder, in that the Licensee has received and is receiving Federal financial assistance and has discriminated and is discriminating against the Petitioners 'solely by reason of [their] handicap', and said Petitioners have been and are 'excluded from participation in [and have been and are denied] the benefits of, [and have been and are being] subjected to discrimination' under the television services in connection with which Licensee has been and is receiving Federal financial assistance." App. in No. 79–1722 (CADC), p. 26 (brackets in original).

[3] "Captioning" refers to any of several technologies, see *Captioning for the Deaf*, 63 F. C. C. 2d 378 (1976), that project written text onto a television image so that deaf viewers receive information that is communicated to others by the soundtrack. See also n. 8, *infra*.

[4] "Contrary to Petitioners' unsupported charges (Petition, p. 3), KCET has responded to the needs of deaf and hearing-impaired persons in its service area. It has done so with three different types of programming: (a) *Captioned ABC Evening News;* (b) a variety of other programs, including children's programs, which were captioned or signed so as to be understandable to the deaf and hearing-impaired; and (c) special programs which

explained why its two daily broadcasts of the ABC captioned news had usually been scheduled for 11:30 p. m. and 6:30 a. m. The licensee specifically denied that it had violated § 504 and averred that the Commission is not an appropriate forum for the adjudication of Rehabilitation Act claims. *Id.*, at 113.

On December 22, 1977, Gottfried filed a verified response, criticizing the station's public survey, and commenting further on the station's failure to rebroadcast ABC captioned news programs before May 23, 1977. The response renewed the charge that the station had violated § 504,[5] and asserted that the Federal Communications Commission was indeed the proper forum to evaluate that charge.[6]

---

have directly addressed needs and concerns of the deaf and hearing-impaired.

.     .     .     .     .

"Over the past three years, KCET has presented more than 960 programs which were either captioned, signed or, in rare instances, which had no spoken words in them at all. All of these programs were understandable to the deaf and hearing-impaired. In many instances, KCET has promoted these programs by listing them as designed for the hearing-impaired audience. During the past three years, in addition to *ABC Captioned News*, these broadcasts have included such programs as 'Zoom', 'Once Upon a Classic', 'Nova', films of Ingmar Bergman, 'The Tribal Eye', 'Masterpiece Theatre', 'Adams Chronicles', 'President Carter's Clinton, Massachusetts Town Meeting', and many others.

"In addition to programs designed to be understood by the deaf and hearing-impaired, KCET has devoted several special programs to substantive issues affecting those groups." App. in No. 79–1722 (CADC), pp. 106, 109.

[5] The response stated:

"[T]he station has not been responsive to the needs of the deaf and hearing impaired. In the station's viewing area, the deaf 20% of the population are not getting 20% of broadcast time; they were not even getting what other deaf in other viewing areas were receiving." *Id.*, at 148.

[6] The response continued:

"The Commission is a proper forum for the adjudication of claims of discrimination in broadcasting, as it is the Commission's obligation—even apart from the Act—to determine how the station has discharged its public

Gottfried also filed separate formal objections to the renewal of seven commercial television station licenses in the Los Angeles area. *E. g.*, *id.*, at 199. The Commission consolidated all eight proceedings and ruled on Gottfried's objections in a single memorandum opinion adopted on August 8, 1978. 69 F. C. C. 2d 451.

The Commission first reviewed its own efforts to encourage the industry to serve the needs of the hearing impaired. In 1970, the Commission had issued a Public Notice to all licensees, advising them of the special needs of the deaf in responding to emergency situations as well as in appreciating general television programming.[7] In 1972, the Commission had granted authority to the Public Broadcasting System to begin experimentation with a "closed" captioning system, which would enable hearing-impaired persons with specially equipped television sets to receive captioned information that could not be seen by the remainder of the viewing audience.[8]

---

trust obligations. The Act and the regulations thereunder, merely give further statutory and regulatory emphasis to that which the Commission is already charged to do under the law." *Id.*, at 150.

[7] *The Use of Telecasts to Inform and Alert Viewers with Impaired Hearing*, 26 F. C. C. 2d 917 (1970). The Commission described the effect of its 1970 action as follows:

"[I]t was suggested that television stations could make use of visual as well as oral announcements of emergencies, utilize the fac[e] of newscasters wherever possible so as to permit lip reading, and feature visualization of materials in news, weather, and sports programs. The Commission hoped that the notice would alert licensees to our concern for the needs of the hearing impaired citizen and make television a truly valuable medium for that segment of the population—estimated by the Department of Health, Education, and Welfare to include 13.4 million persons. We observed, however, that 'it may be necessary to begin rule making looking toward the adoption of minimum requirements.'" 69 F. C. C. 2d, at 454.

[8] "Through the use of an encoder at the transmitting end and a decoder at the receiving end, this closed captioning system could supply visual information—captioning—of the aural portion of the television program to those hearing impaired persons whose television sets were equipped to receive the captioned information while the rest of the viewing public would receive the normal visual and aural transmission. This differs from 'open'

In 1976, the Commission had adopted a rule requiring television licensees to broadcast emergency information visually. In that year, however, the Commission had also concluded that there were so many unanswered questions—both technical and financial—concerning the most effective means of improving television service for the hearing impaired, that it remained "the responsibility of each licensee to determine how it [could] most effectively meet those needs."[9] The Commission summarized its views concerning mandated forms of technology by noting that "there is no requirement that any television licensee—commercial or noncommercial—provide open or closed captioning or any other form of special visual program material other than for broadcasting emergency information." *Id.*, at 455.

The Commission then turned to Gottfried's objections to the eight license renewals. It approached the question whether the renewals would serve the public interest, convenience, and necessity from three different perspectives: ascertainment, programming, and § 504 of the Rehabilitation Act. It first found that the licensees' efforts to ascertain the special needs of the community were adequate. Next, it held that the facts alleged by Gottfried did not give rise to a substantial and material question whether any of the eight stations had abused its discretion in its selection of programming matter. The Commission explained that it is more difficult to provide special programming for the hearing impaired than for other segments of the community;[10] in the

captioning utilized, for example, by PBS in its rebroadcast of the *ABC Evening News.* Open captioning is transmitted to all viewers who see a printed display of the text of the aural transmission at the bottom of the visual transmission." *Ibid.*

[9] *Captioning for the Deaf*, 63 F. C. C 2d, at 389.

[10] "Generally speaking, [special programming for other segments of the community] can be achieved without any additional production techniques other than those utilized for regular programming. Obviously, that is not the situation confronting a licensee who might wish to program for the aurally handicapped. For such programming to be effective, it must offer some specific form of visual communication: sign language interpretations,

absence of any Commission requirement for specialized programming techniques, it found "no basis to fault a licensee for failure to provide these options for the deaf and hearing impaired in the station service area." *Id.*, at 458.

The Commission held that § 504 of the Rehabilitation Act had no application to the seven commercial licensees because they were not alleged to have received any federal financial assistance. The Commission agreed that KCET–TV might be governed by § 504, and that a violation of the Act would need to be considered in a license renewal proceeding, but it saw no reason to consider § 504 in the absence of an adverse finding by the Department of Health, Education, and Welfare—"the proper governmental agency to consider such matters." *Id.*, at 459.

On May 29, 1979, the Commission adopted a second memorandum opinion and order denying Gottfried's petition for reconsideration. 72 F. C. C. 2d 273. The Commission again reviewed Gottfried's § 504 charge and again concluded that the Rehabilitation Act does not apply to commercial stations and that the allegations against KCET–TV under that Act were premature unless and until the agency with authority to enforce compliance determined that the station had violated its provisions. The Commission also rejected Gottfried's additional argument that it had a duty to adopt regulations to implement § 504. Finally, the Commission refused to hold that either its omission of a rule requiring "captioning or other techniques to enable the deaf and hearing impaired to have full access to television broadcasts," or the failure of the licensees to provide such services, was a violation of the "public interest" standard embodied in § 309 of the Communications Act of 1934, as amended. The Commission held:

---

captioning, or extensive utilization of charts, signs, and facial closeups to permit lip reading. Even sign language and lip reading efforts, according to Gottfried, serve to limit the number of deaf and hearing impaired since many do not effectively understand these methods." 69 F. C. C. 2d, at 458.

"We find no error and nothing inconsistent in concluding that licensees are serving the public interest although they are not currently providing captioning, in view of the fact that we have not required licensees to undertake such an activity. Furthermore, to judge a licensee's qualifications on the basis of the retroactive application of such a requirement would, in our opinion, raise serious questions of fundamental fairness. Thus, there is no inconsistency or error in our finding that the subject licensees had met their public interest burden even though they did not caption their programming." *Id.*, at 279.

Gottfried appealed the decision of the Commission to the Court of Appeals for the District of Columbia Circuit, pursuant to 47 U. S. C. § 402. The Court of Appeals affirmed the portion of the Commission's order that related to the commercial stations but vacated the renewal of the KCET–TV license and remanded for further proceedings. 210 U. S. App. D. C. 184, 655 F. 2d 297 (1981).

The court held that Congress did not intend the Commission's renewal of a broadcast license to be considered a form of "financial assistance" within the meaning of § 504 and therefore that the Rehabilitation Act did not directly apply to the seven commercial stations. The court was persuaded, however, that the Act reflected a national policy of extending increased opportunities to the hearing impaired and that commercial stations must therefore make some accommodation for the hard of hearing, given the Communications Act's general requirement that licensees serve the "public interest, convenience, and necessity." 47 U. S. C. §§ 307(d), 309(a), 309(d). In the absence of a more specific statutory directive than that contained in the public interest standard, however, the court accepted the Commission's judgment that the commercial licenses should be renewed. "Recognizing that the Commission possesses special competence in weighing the factors of technological feasibility and economic viability that the concept of the public interest must embrace, we defer to-

day to its judgment." 210 U. S. App. D. C., at 202–203, 655 F. 2d, at 315–316 (footnote omitted).

The majority of the Court of Appeals reached a different conclusion with respect to KCET–TV. As a recipient of federal financial assistance, the public station was admittedly under a duty to comply with § 504. The Court of Appeals did not hold that KCET–TV had violated § 504, or that its efforts to provide programming for the hearing impaired were less satisfactory than the efforts of the commercial licensees; nevertheless, it held that a stricter "public interest" standard should be applied to a licensee covered by § 504 than to a commercial licensee. Its narrow holding was that the Commission could not find the service of public stations "to be adequate to justify renewal without at least inquiring specifically into their efforts to meet the programming needs of the hearing impaired." *Id.*, at 188, 655 F. 2d, at 301.

Judge McGowan dissented in part. He agreed with the majority's view concerning commercial stations that rulemaking would be "a better, fairer, and more effective vehicle for considering how the broadcast industry is required to provide the enjoyment and educational benefits of television to persons with impaired hearing," *id.*, at 188, 203, 655 F. 2d, at 301, 316, than case-by-case adjudication in license renewal proceedings. He felt, however, that the same standard should be applied to public stations until regulations had been issued by the Department of Education dealing specifically with the rights of access of the hearing impaired to television programs.[11] Judge McGowan stated: "[F]orm is favored over substance when commercial stations are, for this reason, spared the expense and uncertainty of renewal hearings, and a noncommercial station is not. Neither, on the record before us, had advance notice during their expired license terms of what was, and therefore could reasonably be, ex-

---

[11] Judge McGowan pointed out that on January 19, 1981, the Department of Education had issued a notice of intent to develop such regulations, and invited comments by March 5, 1981. 210 U. S. App. D. C., at 204, 655 F. 2d, at 317. See 46 Fed. Reg. 4954.

pected of them with respect to the wholly laudable, but technically complex, objective of providing access for the hearing impaired." *Id.*, at 204, 655 F. 2d, at 317.

Both the Commission and the licensee petitioned for certiorari. Because of the serious implications of the Court of Appeals' holding on the status of licenses of public broadcasting stations, we granted both petitions. 454 U. S. 1141 (1982).

## II

All parties agree that the public interest would be served by making television broadcasting more available and more understandable to the substantial portion of our population that is handicapped by impaired hearing.[12] The Commission recognized this component of the public interest even before the enactment of the Rehabilitation Act of 1973, see *The Use of Telecasts to Inform and Alert Viewers with Impaired Hearing*, 26 F. C. C. 2d 917 (1970), and that statute confirms the federal interest in developing the opportunities for all individuals with handicaps to live full and independent lives. No party suggests that a licensee, whether commercial or public, may simply ignore the needs of the hearing impaired in discharging its responsibilities to the community which it serves.[13]

---

[12] "Estimates of the number of citizens who have impaired hearing and therefore have need for the receipt of news and entertainment material through appropriate television programming range from 8.5 million to 20 million. Many of these persons, it appears, live alone and oftentimes do not receive important new information unless advised by neighbors or friends." *The Use of Telecasts to Inform and Alert Viewers with Impaired Hearing*, 26 F. C. C. 2d 917 (1970).

[13] As the Commission has observed:

"In the fulfillment of his obligation the broadcaster should consider the tastes, needs and desires of the public he is licensed to serve . . . . He should reasonably attempt to meet all such needs and interests on an equitable basis." Report and Statement on Policy Re: Commission's En Banc Programming Inquiry, 25 Fed. Reg. 7291, 7295 (1960).

Accord, *In re Applications of Alabama Educational Television Comm'n*, 50 F. C. C. 2d 461, 472 (1975); *In re Applications of Capitol Broadcasting Co.*, 38 F. C. C. 1135, 1139 (1965).

We are not persuaded, however, that Congress intended the Rehabilitation Act of 1973 to impose any new enforcement obligation on the Federal Communications Commission.[14] As originally enacted, the Act did not expressly allocate enforcement responsibility. See Pub. L. 93–112, Tit. V, § 504, 87 Stat. 394. Nevertheless, since § 504 was patterned after Title VI of the Civil Rights Act of 1964, it was understood that responsibility for enforcing it, insofar as it regulated private recipients of federal funds, would lie with those agencies administering the federal financial assistance programs. See S. Rep. No. 93–1297, pp. 39–40 (1974). When the Act was amended in 1978, that understanding was made explicit. See Pub. L. 95–602, Tit. I, § 119, 92 Stat. 2982; n. 1, *supra*. It is clear that the Commission is not a funding agency and has never been thought to have responsibility for enforcing § 504.[15] Furthermore, there is not a

---

[14] If such an enforcement obligation existed, it would have to derive from the Rehabilitation Act itself, since the general words "public interest" in the Communications Act are not sufficient to create it. In *McLean Trucking Co.* v. *United States*, 321 U. S. 67 (1944), we observed that an agency charged with promoting the "public interest" in a particular substantive area may not simply "ignore" the policies underlying other federal statutes. *Id.*, at 80. But we also emphasized that such an agency is not automatically given "either the duty or the authority to execute numerous other laws." *Id.*, at 79. Thus, in *McLean Trucking* the Interstate Commerce Commission had an administrative duty to consider the effect of a motor carrier merger on competing motor carriers in determining whether the merger would effectuate overall transportation policy, *id.*, at 87, yet was "not to measure proposals for all-rail or all-motor consolidations by the standards of the anti-trust laws," *id.*, at 85. Here, the FCC has an administrative duty to consider the needs of handicapped citizens in determining whether a license renewal would effectuate the policies behind the Communications Act but is by no means required to measure proposals for public television license renewals by the standards of § 504 of the Rehabilitation Act.

[15] In 1976, the President designated the Department of Health, Education, and Welfare as the agency responsible for coordinating the implementation of § 504. See Exec. Order No. 11914, 3 CFR 117 (1977). In 1980 that Executive Order was revoked and replaced by Exec. Order No. 12250,

word in the legislative history of the Act suggesting that it was intended to alter the Commission's standard for reviewing the programming decisions of public television licensees.

If a licensee should be found guilty of violating the Rehabilitation Act, or indeed of violating any other federal statute, the Commission would certainly be obligated to consider the possible relevance of such a violation in determining whether or not to renew the lawbreaker's license.[16]  But in the absence of a direction in the Rehabilitation Act itself, and without any expression of such intent in the legislative history, we are unwilling to assume that Congress has instructed the Federal Communications Commission to take original jurisdiction over the processing of charges that its regulatees have violated that Act.[17]

---

3 CFR 298 (1981), which transferred the coordination and enforcement of authority for § 504 from HEW to the Department of Justice.  Regulations previously adopted by HEW remain in effect pending the adoption of new regulations by the Department of Justice.  See 28 CFR pt. 41 (1982).

[16] The Commission has explained its policy as follows:

"Normally, we have declined to explore matters currently being litigated before the courts or to duplicate the ongoing investigative efforts of other government agencies charged with the responsibility of interpreting and enforcing the laws in question.  Our restraint in this respect has not been predicated upon the unlikelihood of proving the violation of law.  Indeed, conduct which does not contravene law may still run afoul of the public interest standard. . . . By our forbearance we have sought to maintain a proper working relationship with the judiciary and other governmental agencies and to avoid burdening applicants with unnecessary, costly multiple proceedings." FCC Form 303, 59 F. C. C. 2d 750, 763 (1976).

[17] This is not to say that the Commission may permit a licensee to ignore the needs of particular groups within the viewing public.  The point is that the Commission's duties derive from the Communications Act, not from other federal statutes.  In NAACP v. FPC, 425 U. S. 662, 670, n. 7 (1976), for example, this Court noted that the Commission's equal opportunity regulations could be regarded as "necessary . . . to ensure that its licensees' programming fairly reflects the tastes and viewpoints of minority groups."  We then reiterated, however, that an agency's general duty to

The fact that a public television station has a duty to comply with the Rehabilitation Act does not support the quite different conclusion that the Commission must evaluate a public station's service to the handicapped community by a more stringent standard than that applicable to commercial stations. The interest in having all television stations—public and commercial—consider and serve their handicapped viewers is equally strong. By the same token, it is equally unfair to criticize a licensee—whether public or commercial—for failing to comply with a requirement of which it had no notice.[18] As both the majority and the dissenting judge in the Court of Appeals observed, rulemaking is generally a "better, fairer, and more effective" method of implementing a new industrywide policy than is the uneven application of conditions in isolated license renewal proceedings. That observation should be as determinative in relicensing a public station as it is in relicensing a commercial station.

A federal agency providing financial assistance to a public television station may, of course, attach conditions to its sub-

---

enforce the public interest does not require it to assume responsibility for enforcing legislation that is not directed at the agency:

"It is useful again to draw on the analogy of federal labor law. No less than in the federal legislation defining the national interest in ending employment discrimination, Congress in its earlier labor legislation unmistakably defined the national interest in free collective bargaining. Yet it could hardly be supposed that in directing the Federal Power Commission to be guided by the 'public interest,' Congress thereby instructed it to take original jurisdiction over the processing of charges of unfair labor practices on the part of its regulatees." *Id.*, at 671.

[18] We have previously emphasized the desirability of making changes in licensing policies prospective. In *FCC* v. *National Citizens Committee for Broadcasting*, 436 U. S. 775, 811 (1978), we wrote:

"One of the most significant advantages of the administrative process is its ability to adapt to new circumstances in a flexible manner, see *FCC* v. *Pottsville Broadcasting Co.*, 309 U. S., at 137–138, and we are unwilling to presume that the Commission acts unreasonably when it decides to try out a change in licensing policy primarily on a prospective basis."

sidy that will have the effect of subjecting such a licensee to more stringent requirements than must be met by a commercial licensee. Or regulations may be promulgated under the Rehabilitation Act that impose special obligations on the subsidized licensee. Conceivably, the Federal Communications Commission might determine that the policies underlying the Communications Act require extraordinary efforts to make certain types of programming universally accessible, thereby placing heightened responsibility on certain stations. But unless and until such a differential standard has been promulgated, the Federal Communications Commission does not abuse its discretion in interpreting the public interest standard, see *FCC* v. *WNCN Listeners Guild*, 450 U. S. 582 (1981), when it declines to impose a greater obligation to provide special programming for the hearing impaired on a public licensee than on a commercial licensee.[19]

The Court of Appeals was unanimous in its holding that the renewal of the seven commercial licensees was consistent with the public interest requirement in § 309 of the Federal Communications Act. Neither that court nor the Commission suggested that there was anything in the record that would justify treating the public licensee differently from the commercial licensees if both classes were to be judged under the same standard. The Court of Appeals' affirmance of the Commission's rejection of Gottfried's objection to the renewal of the commercial licenses therefore requires a like disposition of the objections to the renewal of the KCET–TV license. Accordingly, the judgment of the Court of Appeals is reversed insofar as it vacated the order of the Commission.

*It is so ordered.*

---

[19] We note the Commission's argument that, if a differential standard were appropriate, commercial stations would be better able to afford the costs associated with special programming than public television stations, which cannot sell advertising and which serve the public in large part by airing programs of specialized interest that lack the mass appeal required for broadcast on network affiliates.

JUSTICE MARSHALL, with whom JUSTICE BRENNAN joins, dissenting.

In determining that the "public interest" would be served by renewal of the broadcast license of public station KCET–TV, the FCC refused to consider whether the station had violated the Rehabilitation Act of 1973 during its previous license term. The Court today holds that this refusal to consider the Rehabilitation Act did not constitute an abuse of discretion. In concluding that the FCC was free to disregard the Rehabilitation Act, the Court emphasizes that "the Commission's duties derive from the Communications Act, not from other federal statutes," *ante*, at 510, n. 17, and that there is no evidence that Congress intended to vest the Commission with power to enforce the Rehabilitation Act, *ante*, at 509. Because the Court's decision is not supported by either precedent or any sound view of the administrative process, I respectfully dissent.

## I

This Court's decisions establish that where an agency has a statutory duty, as does the FCC,[1] to assess the "public interest" in implementing a particular regulatory scheme, the agency must give at least some consideration to other federal statutes that are pertinent to its administrative decision. Although the open-ended phrase "public interest" "take[s] meaning from the purposes of the regulatory legislation" that defines the particular agency's responsibilities, *NAACP* v. *FPC*, 425 U. S. 662, 669 (1976), the agency may not focus on those purposes to the complete exclusion of the policies reflected in other relevant statutes.

The principle that an agency may not ignore a relevant Act of Congress was clearly set forth by Justice Rutledge in his

---

[1] The FCC is directed by statute to grant an application for renewal of a broadcast license only if it finds that the "public interest, convenience, and necessity would be served thereby." 47 U. S. C. § 307(c) (1982 ed.).

opinion for the Court in *McLean Trucking Co.* v. *United States*, 321 U. S. 67 (1944).  In *McLean Trucking* the ICC had approved a proposed consolidation as "'consistent with the public interest.'"  *Id.*, at 75–76, quoting 49 U. S. C. § 5(2)(b).  While recognizing that the ICC's duties derived primarily from the Interstate Commerce Act and related legislation specifically regulating commerce, Justice Rutledge rejected any suggestion that the ICC could therefore ignore other relevant statutes in deciding whether a proposed transaction would serve the "public interest":

> "To secure the continuous, close and informed supervision which enforcement of legislative mandates frequently requires, Congress has vested expert administrative bodies such as the Interstate Commerce Commission with broad discretion and has charged them with the duty to execute stated and specific statutory policies. That delegation does not necessarily include either the duty or the authority to execute numerous other laws. Thus, here, the Commission has no power to enforce the Sherman Act as such.  It cannot decide definitively whether the transaction contemplated constitutes a restraint of trade or an attempt to monopolize which is forbidden by that Act.  The Commission's task is to enforce the Interstate Commerce Act and other legislation which deals specifically with transportation facilities and problems.  That legislation constitutes the immediate frame of reference within which the Commission operates; and the policies expressed in it must be the basic determinants of its action.
>
> "But in executing those policies the Commission may be faced with overlapping and at times inconsistent policies embodied in other legislation enacted at different times and with different problems in view.  *When this is true, it cannot, without more, ignore the latter.*"  321 U. S., at 79–80 (emphasis added).

The Court held that the ICC was obligated to take the Sherman Act into account in deciding whether to approve the proposed consolidation, even though Congress had not given the Commission either the power or the duty to enforce the Act.[2]

Similarly, in *Denver & R. G. W. R. Co.* v. *United States*, 387 U. S. 485 (1967), this Court concluded that "the broad terms 'public interest' and 'lawful object' [in § 20a(2) of the Interstate Commerce Act] negate the existence of a mandate to the ICC to close its eyes to facts indicating that the transaction may exceed limitations imposed by other relevant laws." *Id.*, at 492. JUSTICE BRENNAN explained in his opinion for the Court that "[c]ommon sense and sound administrative policy point to the conclusion that such broad statutory standards require at least some degree of consideration of control and anticompetitive consequences when suggested by the circumstances surrounding a particular transaction." *Ibid.* Accordingly, the Court held that the ICC was required to consider the anticompetitive effect under § 7 of the Clayton Act of a proposed stock issuance by a carrier even though that Act confers no enforcement power on the ICC.

In *Southern S.S. Co.* v. *NLRB*, 316 U. S. 31 (1942), this Court recognized that the National Labor Relations Board must consider federal statutes independent of federal labor law where they are relevant to an issue to be

---

[2] The majority errs in attempting to distinguish *McLean Trucking* by quoting Justice Rutledge's statement that the ICC was "not to measure proposals for all-rail or all-motor consolidations by the standards of the anti-trust laws." 321 U. S., at 85, quoted *ante*, at 509, n. 14. The issue here is not whether the FCC should have measured KCET–TV's application by the same standards that would apply in a proceeding to enforce the Rehabilitation Act, but whether the FCC should have given at least some consideration to the policies underlying the Act. In *McLean Trucking* the Court made it clear that the ICC was not free to ignore the policies underlying the antitrust laws. In addition to the passage quoted in the text, see 321 U. S., at 86 ("Congress . . . neither has made the anti-trust laws wholly inapplicable to the transportation industry nor has authorized the Commission in passing on a proposed merger to ignore their policy").

decided by the Board. Although the Court acknowledged the breadth of the Board's discretion, *id.*, at 46, it concluded that the Board had no discretion to disregard pertinent federal laws: "the Board has not been commissioned to effectuate the policies of the National Labor Relations Act so single-mindedly that it may wholly ignore other and equally important Congressional objectives." *Id.*, at 47. The Court ruled that the Board had abused its discretion in ordering the reinstatement of striking seamen without considering whether the strike had violated either a federal law requiring crew members to promise obedience to their superiors or provisions of the Federal Criminal Code proscribing mutiny and revolt aboard ship.

These decisions establish that, however broad an administrative agency's discretion in implementing a regulatory scheme may be, the agency may not ignore a relevant Act of Congress. The agency need not conclusively determine what the statute in question requires or forbids. See *McLean Trucking Co.* v. *United States, supra,* at 79 (ICC "cannot decide definitively whether the transaction contemplated constitutes a restraint of trade or an attempt to monopolize"). If the agency, after considering the relevant statute, concludes that it should not prevent achievement of the objectives embodied in the regulatory scheme that the agency is specifically empowered to implement, and states reasons for this conclusion, the agency's determination will not lightly be overturned. But the agency cannot simply "close its eyes" to the existence of the statute. *Denver & R. G. W. R. Co.* v. *United States, supra,* at 492.

There are good reasons for this Court's insistence that administrative agencies consider relevant statutes. The objectives of Congress would be ill served if each administrative agency were permitted to disregard any statute that it is not specifically authorized to enforce. "No agency entrusted with determinations of public convenience and necessity is an island. It fits within a national system of regulatory control

of industry." *Palisades Citizens Assn., Inc.* v. *CAB*, 136 U. S. App. D. C. 346, 349, 420 F. 2d 188, 191 (1969). As the Court observed in *Southern S.S. Co.*, "[f]requently the entire scope of Congressional purpose calls for careful accommodation of one statutory scheme to another." 316 U. S., at 47. There can be no accommodation, careful or otherwise, if an agency refuses even to consider a relevant statute.

## II

In light of the principle established by our prior decisions, the Court of Appeals correctly held that it was an abuse of discretion for the FCC to refuse to consider respondent's allegation that KCET–TV had violated § 504 of the Rehabilitation Act.[3]

The relevance of the alleged violation to the Commission's licensing decision is beyond dispute. The chief purpose of the Communications Act was "to make available . . . to *all the people of the United States* a rapid, efficient, Nation-wide, and world-wide wire and radio communication service." 47 U. S. C. § 151 (emphasis added). See *National Broadcasting Co.* v. *United States*, 319 U. S. 190, 217 (1943). The deaf constitute a substantial segment of the population. *Ante*, at 508, n. 12. If, as this Court has stated, the Commission has an "obligation . . . to ensure that its licensees' programming fairly reflects the tastes and viewpoints of minority groups,"

---

[3] Section 504 provides in pertinent part that "[n]o otherwise qualified handicapped individual . . . shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U. S. C. § 794 (1976 ed., Supp. V). Respondents alleged that KCET–TV had violated the Rehabilitation Act by, among other things, failing, for most of its license term, to broadcast a captioned version of the ABC Evening News that was made available to it free of charge by the Public Broadcasting Service, and by thereafter failing to broadcast the program during any prime time hours. It is undisputed that KCET–TV conducts a "program or activity receiving Federal financial assistance" within the meaning of § 504.

*NAACP* v. *FPC*, 425 U. S., at 670, n. 7, then surely it also has an obligation to consider whether a licensee has denied meaningful programming of any kind to a sizable minority group.

Since respondent's allegation that KCET–TV had violated the Rehabilitation Act was relevant to the FCC's determination of whether renewal of the station's license would serve the "public interest," the Commission should have given "at least some degree of consideration" to the Act. *Denver & R. G. W. R. Co.* v. *United States*, 387 U. S., at 492. There is no reason to depart from our traditional insistence that administrative agencies take into account any federal statute that is pertinent to an administrative decision.[4] As the Court noted in *Southern S.S. Co.*, consideration of any pertinent statutes "is not too much to demand of an administrative body." 316 U. S., at 47. The decision of the Court of Appeals demanded no more than this, and the handicapped individuals protected by the Rehabilitation Act are entitled to no less.

---

[4] Contrary to the Court's suggestion, *ante*, at 512, a requirement that the Commission take the Rehabilitation Act into account in its licensing decisions involving public stations would not necessarily subject such stations to a more stringent standard than that applicable to commercial stations, which are not covered by the Act. In the exercise of its discretion, there is nothing to stop the Commission from imposing an equally or more demanding standard on commercial stations if it properly explains why such a standard is justified by the purposes of the Communications Act. For example, commercial stations may be better able to afford the costs of special programming. See *ante*, at 512, n. 19. What the Commission cannot do under our prior decisions is simply ignore the Rehabilitation Act in a licensing proceeding in which that Act is relevant.