840 F.2d 88
 46 Fair Empl.Prac.Cas. 230,
45 Empl. Prac. Dec. P 37,838, 268 U.S.App.D.C. 208,
56 USLW 2524
 CALIFORNIA ASSOCIATION OF THE PHYSICALLY HANDICAPPED, INC.,
et al., Appellants,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee,
Fox Television Stations, Inc., KTLA, Inc., National
Broadcasting Co., Inc., RKO General, Inc., Community
Television of Southern California, KCOP Television, Inc.,
CBS, Inc., Metromedia, Inc., Intervenors.
CALIFORNIA ASSOCIATION OF THE PHYSICALLY HANDICAPPED, INC.,
et al., Appellants,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee,
Tribune Broadcasting Company, Intervenor.
 Nos. 86-1105, 86-1321.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Sept. 15, 1987.
Decided March 4, 1988.
 
 Stanley Fleishman, Beverly Hills, Cal., with whom Robert Lind, was on the brief, for appellants in Nos. 86-1105 and 86-1321.
 C. Grey Pash, Jr., Counsel, F.C.C., with whom Diane S. Killory, General Counsel and Daniel M. Armstrong, Associate General Counsel, for the F.C.C., Washington, D.C., were on the brief, for appellee in Nos. 86-1105 and 86-1321.
 Timothy B. Dyk, with whom Kerry W. Kircher, for CBS, Inc., Michael R. Gardner, and James P. Denvir, for Fox Television Stations, Inc., Richard S. Rodin, for KCOP Television, Inc., Robert A. Beizer, for KTLA Inc., Arthur B. Goodkind, for NBC, Inc., Jack N. Goodman, for RKO General, Inc., were on joint brief, for Intervenors CBS, Inc., et al., in No. 86-1105. Gregory C. Staple also entered an appearance, for NBC, Inc. Judith Barry Wish also entered an appearance, for CBS, Inc. Theodore D. Frank and Marilyn D. Sonn, were on the brief, for Intervenor Community Television of Southern California in No. 86-1105. Mania R. Baghadin, Washington, D.C., also entered an appearance for Community Television of Southern California.
 Robert A. Beizer, Washington, D.C., was on the brief, for Intervenor Tribune Broadcasting Co. in No. 86-1321.
 Before SILBERMAN and D.H. GINSBURG, Circuit Judges, and KOZINSKI,* Circuit Judge, United States Court of Appeals for the Ninth Circuit.
 Opinion for the Court filed by Circuit Judge KOZINSKI.
 KOZINSKI, Circuit Judge:
 
 
 1
 We consider whether the Federal Communications Commission, in approving license renewals and transfers, must take into account the extent to which broadcasters caption[1] television programs for hearing-impaired viewers and whether they have an equal employment opportunity program covering the handicapped.
 
 FACTS
 
 2
 Appellant California Association of the Physically Handicapped, Inc. (CAPH) is a nonprofit corporation representing the interests of handicapped persons. Appellant Sue Gottfried is a deaf Los Angeles television viewer. Intervenors all hold television broadcasting licenses in the Los Angeles metropolitan area. In the two companion cases before us, appellants contend that the intervenors should be denied renewal or transfer of their licenses because they failed to caption a sufficient number of their programs for hearing-impaired viewers and refused to include handicapped persons in EEO programs covering women and minorities.
 
 
 3
 The first case, No. 86-1105, is a third-generation challenge to the renewal of licenses for Los Angeles television stations KCBS, KNBC, KTLA, KABC, KHJ, KTTV, KCOP and KCET.[2] In the first generation, the FCC rejected appellants' petitions to deny those stations' 1977 license renewal applications. License Renewal Applications of Certain Television Stations Licensed for and Serving Los Angeles, California, 69 F.C.C.2d 451 (1978), reconsideration denied, 72 F.C.C.2d 273 (1979). On appeal, we affirmed as to the commercial stations but reversed as to KCET, a public broadcaster. Gottfried v. FCC, 655 F.2d 297 (D.C.Cir.1981). The Supreme Court granted certiorari as to KCET and reversed, upholding the FCC's decision. Community Television of So. Cal. v. Gottfried, 459 U.S. 498, 103 S.Ct. 885, 74 L.Ed.2d 705 (1983).[3]
 
 
 4
 In the meantime, the FCC had rejected appellants' challenges to the stations' captioning and hiring practices in approving the stations' 1980 renewal applications, and we had dismissed the appeals as untimely.[4] In October 1983, after the Supreme Court's decision in Community Television, appellants began the third round of across-theboard challenges by filing separate petitions to deny the 1983 renewal applications. Specifically, they sought a hearing under 47 U.S.C. Sec. 309(e) (1982) on whether, during the previous license period, the licensees had discriminated against qualified handicapped persons in employment and had failed to meet the needs of their hearing-impaired viewers by captioning insufficient television programs.
 
 
 5
 The Chief of the FCC Video Services Division rejected appellants' contentions as "the same arguments previously presented by them against the above-mentioned licensees and rejected by the Commission and the courts." Golden West Television, Inc., File No. BRCT-830801LP, Mimeo 3155, at 3 (Mass Media Bur. March 15, 1985); id. at 4. He concluded that the licensees were not obligated to undertake captioning or institute an EEO program covering the handicapped, and therefore denied appellants' petitions without further inquiry because their allegations did not raise a "substantial and material question" under 47 U.S.C. Sec. 309(e) as to whether renewal was consistent with the public interest standard of the Communications Act, 47 U.S.C. Sec. 309(a) (1982). Noting that renewal proceedings were an inappropriate setting for establishing a captioning requirement, he granted the renewal applications.[5] The FCC denied appellants' joint application for review of the Video Services decision and their petition for reconsideration of that denial.
 
 
 6
 In the second case, No. 86-1321, appellants challenge the FCC's approval of Golden West Associates' petition to transfer the license for station KTLA to Tribune Broadcasting Co. Golden West filed its transfer application on June 7, 1985. Appellants and others filed a petition to deny the application because, they asserted, Golden West had neither captioned sufficient programming nor implemented an EEO program for the handicapped, and Tribune would likely continue these practices. See App., No. 86-1321, at 3-4, 12. The FCC again found appellants' arguments repetitive of those raised in previous proceedings. Golden West Assocs., FCC No. 85-541, 59 Rad.Reg. 2d (P & F) 125, 128, 129 (Oct. 11, 1985). As to KTLA's practices, the FCC found that KTLA had complied with FCC programming standards and had broadcast a number of programs with closed captions. It therefore denied appellants' petition and granted Golden West's transfer application. Id. at 137. The FCC once again noted that the question of captioning was not appropriately considered in an adjudicatory setting, id. at 129, and stated that any future petition that reiterated these arguments would be "rejected summarily and without comment by the Mass Media Bureau." Id. at 128. The FCC denied appellants' joint petition for reconsideration. FCC No. 86-235 (May 13, 1986). The two cases have been consolidated before us.
 
 DISCUSSION
 
 7
 * A. Appellants argue that the Rehabilitation Act of 1973, as amended in 1978, obligates the FCC to consider the licensee's captioning practices in determining whether to renew a broadcast license.[6] Section 504 of the 1973 Act barred discrimination against or denial of benefits to an "otherwise qualified handicapped individual" on the basis of the handicap "under any program or activity receiving Federal financial assistance." 29 U.S.C. Sec. 794 (1976). In 1978, Congress amended section 504 to extend coverage to "any program or activity conducted by any Executive agency...." Rehabilitation, Comprehensive Services, and Developmental Disabilities Act of 1978, Pub.L. No. 95-602, 92 Stat. 2982 (1978).[7]
 
 
 8
 Whatever obligation to caption programs broadcasters may have under section 504 of the Rehabilitation Act, it is settled that the FCC is not responsible for enforcing it through its licensing procedures. In Community Television, the Supreme Court held that the FCC "is not a funding agency and has never been thought to have responsibility for enforcing Sec. 504." 459 U.S. at 509, 103 S.Ct. at 892.[8] Enforcement of section 504 has been committed instead to the federal agencies administering the federal financial assistance programs, Community Television, 459 U.S. at 509, 103 S.Ct. at 892, which, in the case of broadcasters, are principally the Departments of Education and Commerce. See 34 C.F.R. pt. 104 (1987) (Education regulations implementing section 504); 15 C.F.R. Sec. 2301.29(c) (1987) (Commerce enforcement duties assigned to the National Telecommunications and Information Administration, which administers facilities grants). In particular, the Supreme Court noted, "there is not a word in the legislative history of the Act suggesting that it was intended to alter the Commission's standard for reviewing ... programming decisions...." Community Television, 459 U.S. at 509-10, 103 S.Ct. at 892.
 
 
 9
 Intervenors, with the exception of Community Television (KCET), are private commercial broadcasters; they do not receive federal financial assistance and therefore are not subject to section 504. Gottfried, 655 F.2d at 312. KCET, a public television station, receives federal funding for programming and equipment. The Department of Education requires that KCET broadcast with closed captions all programs produced with captions, and caption all programs the station itself produces with Department funds. See Greater Los Angeles Council on Deafness, Inc. v. Community Television of So. Cal., 719 F.2d 1017, 1020 n. 5, 1023 (9th Cir.1983) (GLAD ), cert. denied, 467 U.S. 1252, 104 S.Ct. 3535, 82 L.Ed.2d 840 (1984). The Department of Education, however, has the enforcement responsibility, not the FCC. "[T]he Commission's duties derive from the Communications Act, not from other federal statutes." Community Television, 459 U.S. at 510 n. 17, 103 S.Ct. at 893 n. 17; see GLAD, 719 F.2d at 1022 (reversing district court order that required FCC and Attorney General to promulgate section 504 compliance standards, required open captioning of federally funded programs, and permitted disbursement of federal public television funds only for open captioning until Education Department had issued appropriate rules). KCET is therefore subject to the same captioning standard as commercial stations in FCC licensing proceedings. Community Television, 459 U.S. at 511-12, 103 S.Ct. at 893-94.
 
 
 10
 Appellants seek to distinguish these cases on the ground that the courts there allegedly were construing section 504 prior to its amendment in 1978, which extended its reach to "any program or activity conducted by any Executive agency." This is not so. Although Community Television arose out of appellants' challenge to the 1977 license renewals, the Supreme Court considered section 504 as amended. See 459 U.S. at 500 n. 1, 103 S.Ct. at 887 n. 1. Indeed, the Court noted that "[w]hen the Act was amended in 1978, that understanding [that the funding agencies alone would have to enforce section 504] was made explicit." Id. at 509, 103 S.Ct. at 892. The Ninth Circuit similarly applied the amended statute in rejecting appellants' arguments. See CAPH v. FCC, 721 F.2d 667, 669 n. 1 (9th Cir.1983), cert. denied, 469 U.S. 832, 105 S.Ct. 121, 83 L.Ed.2d 63 (1984); GLAD, 719 F.2d at 1019 n. 1.
 
 
 11
 In any event, the 1978 amendment does not affect the outcome in this case: The phrase "program or activity conducted by any Executive agency" encompasses only the FCC's own activities, not those of entities licensed or certified by it. See Amendment of Part 1 of the Commissions' Rules to Implement Section 504 of the Rehabilitation Act of 1973, as Amended, 2 F.C.C. Rcd 2199, 2199, 2200 (1987) (adopting 47 C.F.R. Sec. 1.1802), petition for review pending, CAPH v. FCC, No. 87-7193 (9th Cir. filed May 4, 1987).[9] The FCC rejected CAPH's interpretation of the amended statute when it promulgated the implementing regulations, stating that "the programming or activity of a broadcaster licensed by the Commission is not a 'program or activity conducted by' the Commission itself and is thus unaffected by the 1978 amendments." 2 F.C.C. Rcd at 2204; see also Rules to Implement Section 504 of the Rehabilitation Act of 1973, 50 Fed.Reg. 35262, 35262 n. 4, 35263 (FCC 1985) (proposed rules). The Department of Justice similarly construed the 1978 amendment in drafting prototype regulations for other federal agencies pursuant to Executive Order No. 12250, 3 C.F.R. 298 (1981).[10] This is a reasonable interpretation of the statutory mandate, and we therefore accord it substantial deference. Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984); see NLRB v. United Food & Commercial Workers Union, Local 23, --- U.S. ----, 108 S.Ct. 413, 426-27, 98 L.Ed.2d 429 (1987) (Scalia, J., concurring). Neither section 504 nor the implementing regulations impose any captioning obligation on the broadcasters, nor any duty on the FCC to consider captioning practices in its licensing decisions.
 
 
 12
 B. Appellants also argue that the Communications Act compels the FCC to impose captioning requirements. Section 309 provides that the FCC shall award broadcast licenses on the basis that "public interest, convenience, and necessity will be served" by doing so. 47 U.S.C. Sec. 309(a) (1982). Appellants make two related contentions. First, they assert that even if section 504 of the Rehabilitation Act does not govern licensing standards, the public interest standard of section 309 incorporates the national policy section 504 embodies. This argument has been rejected by the courts. As the Ninth Circuit noted, "[t]he court ruled [in Community Television ] that ... the public interest standard of the Communications Act was insufficient to create any obligation to enforce Section 504 or incorporate that section's standards into the Communications Act." CAPH, 721 F.2d at 670 (citing Community Television, 459 U.S. at 509 n. 14, 103 S.Ct. at 892 n. 14). The Rehabilitation Act does not compel through the Communications Act what it does not compel directly.
 
 
 13
 Second, appellants rely on the Communications Act's public interest standard, arguing that it would be in the best interests of the American people for broadcasters to make all of their programs accessible to the hearing impaired. That may be so. See Community Television, 459 U.S. at 508, 103 S.Ct. at 891. However, "the Commission enjoys broad discretion in evaluating the statutorily mandated standard of the 'public interest.' " Listeners' Guild, Inc. v. FCC, 813 F.2d 465, 468 (D.C.Cir.1987). We give substantial deference to the FCC's judgment about where the public interest lies. See Gottfried, 655 F.2d at 310; see also FCC v. WNCN Listeners Guild, 450 U.S. 582, 593-95, 101 S.Ct. 1266, 1273-75, 67 L.Ed.2d 521 (1981); FCC v. National Citizens Comm. for Broadcasting, 436 U.S. 775, 814, 98 S.Ct. 2096, 2121, 56 L.Ed.2d 697 (1978). Because of the changing nature of captioning technology, the FCC has left the implementation of programming for the hearing impaired to the voluntary initiatives of broadcasters, and has required captioning only for emergency message broadcasts. See 47 C.F.R. Sec. 73.1250(h) (1987). The FCC has attempted to facilitate captioning,[11] suggested aspirational targets for broadcasters, admonished them to make all reasonable efforts to reach out to handicapped viewers, and warned that it might one day consider setting minimum standards.[12] The FCC is apparently satisfied with the progress of broadcaster captioning. It is well within its statutory authority not to make captioning mandatory. Cf. Action for Children's Television v. FCC, 564 F.2d 458, 479, 481 (D.C.Cir.1977) (upholding FCC's decision "not to adopt specific regulations governing ... programming practices for children's television" and to rely on broadcasters' "self-regulatory efforts"); Washington Ass'n for Television & Children v. FCC, 712 F.2d 677, 684 (D.C.Cir.1983). Its denial of appellants' successive and repetitive petitions without a hearing was not an abuse of discretion.[13]
 
 II
 
 14
 Appellants also challenge the FCC's refusal to consider broadcasters' hiring practices pertaining to the handicapped. Appellants do not allege that any of the licensees have discriminated against the handicapped in employment, only that the licensees have failed to establish EEO programs covering them. There being no factual issue requiring a hearing, appellants' petition stands or falls on the legal question whether the FCC must require stations to adopt EEO programs for the handicapped.
 
 
 15
 FCC regulations prohibit licensees from discriminating in employment on the basis of "race, color, religion, national origin or sex" and require the licensees "to establish, maintain, and carry out, a positive continuing program of specific practices designed to assure equal opportunity in every aspect of station employment policy and practice." 47 C.F.R. Sec. 73.2080(a), (b) (1986). In September 1977, CAPH and others petitioned the FCC for a rulemaking on the inclusion of the handicapped in the FCC's EEO rules and preferences for the handicapped in the ownership and management of broadcast facilities. After notice and public comment, the FCC decided not to require licensees to include the handicapped in their EEO programs. Amendment of Broadcast Equal Opportunity Rules and FCC Form 395, 76 F.C.C.2d 86, reconsideration denied, 80 F.C.C.2d 299 (1980).[14] On CAPH's appeal from the FCC's decision, the Ninth Circuit squarely rejected precisely the same arguments appellants make here. CAPH, 721 F.2d at 669 (also affirming California Paralyzed Veterans Ass'n v. FCC, 496 F.Supp. 125 (C.D.Cal.1980) (dismissing CAPH's suit to compel FCC to promulgate EEO rules for the handicapped)).
 
 
 16
 Appellants' statutory arguments as to hiring are essentially the same as those pertaining to captioning. They are no more convincing. The Communications Act does not impose an obligation on the FCC to require EEO programs for the handicapped. Id. at 670. Furthermore, because the FCC is not a funding agency, it has no duty to enforce section 504 of the Rehabilitation Act as to the employment practices of its licensees. Id. The FCC has, however, stated that if a court or one of the agencies having primary enforcement responsibility finds that a licensee has violated section 504, it will take that finding into account in determining whether to renew the license. See 76 F.C.C.2d at 99 ("an established violation of law clearly raises a question as to an applicant's qualifications to be a broadcast licensee"); 69 F.C.C.2d at 458-59 ("in the event some adverse finding were to be made relative to Section 504, the Commission would take whatever action would be appropriate"). It is well within the FCC's discretion not to impose on broadcasters EEO obligations toward the handicapped. See CAPH, 721 F.2d at 670.
 
 
 17
 Appellants also claim that, by treating the handicapped differently from other minorities, the FCC has denied them their fifth amendment right to equal protection of the laws. We join the Ninth Circuit in rejecting this argument. CAPH, 721 F.2d at 670. In affirming the FCC decision, the Ninth Circuit relied on the FCC's representation that "in light of the problems unique to handicapped persons, setting up an EEO program to monitor employment of the handicapped by FCC licensees required more resources and expertise than was required for similar programs designed to prevent employment discrimination against women and minorities." Id. at 670; see 76 F.C.C.2d at 95, 99. We agree with the Ninth Circuit that the FCC's decision not to include the handicapped in its EEO rules was reasonable, and that the FCC did not deprive the handicapped of equal protection of the laws. CAPH, 721 F.2d at 670 (citing McLaughlin v. Florida, 379 U.S. 184, 191, 85 S.Ct. 283, 288, 13 L.Ed.2d 222 (1964)).
 
 III
 
 18
 As appellants themselves admit, "the primary object of [their] petitions to deny is to force the Commission to adopt minimum captioning requirements for its licensees," and "to change its licensing policies prospectively with regard to ... equal employment opportunities for handicapped people." Reply Brief for Appellants, No. 86-1105, at 1; Brief for Appellants, No. 86-1321, at 36. Having failed to convince the FCC to impose such requirements through notice-and-comment rulemaking, appellants have repeatedly challenged license renewals and transfers in adjudicatory proceedings before the FCC, this court and the Supreme Court. The FCC has responded by announcing that, in the future, it will summarily reject petitions to deny license applications on the ground of inadequate captioning. The Commission has repeatedly taken the position that adjudicatory proceedings are an inappropriate forum for promulgating captioning requirements because of the arbitrariness of retroactive application and the inherent constraints of the adjudicatory process. The Supreme Court upheld this approach in Community Television, stating that "rulemaking is generally a 'better, fairer, and more effective' method of implementing a new industrywide policy than is the uneven application of conditions in isolated license renewal proceedings." 459 U.S. at 511, 103 S.Ct. at 893 (quoting Gottfried, 655 F.2d at 301, 316).
 
 
 19
 Contrary to appellants' assertions, the Court did not impose any rulemaking responsibility on the FCC with respect to captioning, but rather "held that the FCC ... has no responsibility for enforcement and no duty to promulgate regulations." GLAD, 719 F.2d at 1022 (citing Community Television, 459 U.S. at 512, 103 S.Ct. at 893). Appellants' continued attempts to force the FCC to impose captioning and hiring requirements in proceedings involving license renewals and transfers are simply inappropriate, and the FCC was well within its statutory authority in adopting a policy of summarily dismissing appellants' petitions.
 
 CONCLUSION
 
 20
 The decisions of the FCC denying appellants' petitions to deny intervenors' applications to renew and transfer broadcast licenses are
 
 
 21
 Affirmed.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. Sec. 291(a) (1982)
 
 
 [1]
 " 'Captioning' refers to any of several technologies ... that project written text onto a television image so that deaf viewers receive information that is communicated to others by the soundtrack.' " Community Television of So. Cal. v. Gottfried, 459 U.S. 498, 501 n. 3, 103 S.Ct. 885, 888 n. 3, 74 L.Ed.2d 705 (1983)
 
 
 [2]
 Appellants do not challenge the denial of their petition as to station KABC because they are now satisfied with the extent of its captioning. Brief for Appellants at 3 n. 1
 
 
 [3]
 The Supreme Court denied Gottfried's cross-petition for certiorari from our decision as to the commercial broadcasters. Gottfried v. FCC, 454 U.S. 1144, 102 S.Ct. 1004, 71 L.Ed.2d 296 (1982)
 
 
 [4]
 See KCOP Television, Inc., File No. BRCT-102, Mimeo 561 (Mass Media Bur. Nov. 3, 1983), reconsideration denied, Mimeo 14 (Mass Media Bur. Oct. 2, 1984), appeal dismissed, Gottfried v. FCC, No. 84-1541 (D.C.Cir. Jan. 9, 1985) (all stations except KCET and KTLA); Community Television of So. Cal., File No. BRET-800801LN, Mimeo 5974, 54 Rad.Reg.2d (P & F) 857 (Mass Media Bur. Aug. 18, 1983), reconsideration denied, Mimeo 31 (Mass Media Bur. Oct. 4, 1984) (KCET); Golden West Television, Inc., File No. BRCT-100, Mimeo 3243, 53 Rad.Reg.2d (P & F) 854 (Mass Media Bur. March 30, 1983), reconsideration denied, Mimeo 2545 (Mass Media Bur. Feb. 27, 1984), review denied, FCC No. 84-537 (Nov. 16, 1984), appeal dismissed, Gottfried v. FCC, No. 85-1001 (D.C.Cir. March 12, 1985) (renewal and transfer of KTLA license)
 
 
 [5]
 The FCC actually approved the renewal applications for all intervenors except KHJ. KHJ had not applied for renewal because its 1980 application was still in litigation for other reasons. The FCC nevertheless ruled on appellants' petition as to that station as well
 
 
 [6]
 In No. 86-1321, appellants make similar arguments as to the FCC's approval of the KTLA license transfer. We do not reach the merits of these arguments because appellants lack standing to challenge the license transfer; the challenged action did not cause the wrong they seek to remedy. See CAPH v. FCC, 778 F.2d 823, 825-27 (D.C.Cir.1985) (CAPH has no standing to challenge FCC's approval of stock transfer where de facto control of station would remain in the same hands). Appellants did not contend that Tribune would initiate bad policies or end captioning and hiring programs begun by Golden West; they alleged only that Tribune would continue its predecessor's practices. Whether the FCC denied or approved the transfer application would thus have no "practical impact" on the policies of station KTLA. See id. at 827 n. 12. "In sum, CAPH's alleged injury occurred before, existed at the time of, and continued unchanged after the challenged Commission action. CAPH, therefore, cannot tenably trace the asserted injury to the FCC's approval of [the] transfer application." Id. at 827. Appellants do have standing in renewal proceedings because "the renewal of the license would regenerate the continuing injury that CAPH's constituency suffers as a result of the station's alleged practices: without a license renewal, the ... station would be incapable of continuing those practices." Id. at 826 n. 11
 
 
 [7]
 Section 504, as amended in 1986, provides in full:
 No otherwise qualified individual with handicaps in the United States, as defined in section 706(8) of this title, shall, solely by reason of his handicap, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service. The head of each such agency shall promulgate such regulations as may be necessary to carry out the amendments to this section made by the Rehabilitation, Comprehensive Services, and Developmental Disabilities Act of 1978. Copies of any proposed regulation shall be submitted to appropriate authorizing committees of the Congress, and such regulation may take effect no earlier than the thirtieth day after the date on which such regulation is so submitted to such committees.
 29 U.S.C.A. Sec. 794 (West Supp.1987).
 
 
 [8]
 Although broadcast licenses are certainly valuable, "[c]ontrary to CAPH's contention, ... it is now clear that [they] are not a form of federal financial assistance within the context of Section 504." CAPH v. FCC, 721 F.2d 667, 669 (9th Cir.1983), cert. denied, 469 U.S. 832, 105 S.Ct. 121, 83 L.Ed.2d 63 (1984); see Community Television, 459 U.S. at 509-10, 103 S.Ct. at 892-93; Gottfried, 655 F.2d at 312; Greater Los Angeles Council on Deafness, Inc. v. Community Television of So. Cal., 719 F.2d 1017, 1022-23 (9th Cir.1983) (GLAD), cert. denied, 467 U.S. 1252, 104 S.Ct. 3535, 82 L.Ed.2d 840 (1984); cf. Paralyzed Veterans of Am. v. Civil Aeronautics Bd., 752 F.2d 694, 707-08 (D.C.Cir.1985) (airline operating certificates are not "Federal financial assistance" within the meaning of section 504), rev'd on other grounds sub nom. United States Dep't of Transp. v. Paralyzed Veterans of Am., 477 U.S. 597, 106 S.Ct. 2705, 91 L.Ed.2d 494 (1986). Moreover, any benefits or services by federal personnel that licensees may receive as the result of federal regulation and licensure do not constitute "Federal financial assistance." 29 U.S.C. Sec. 794; see Paralyzed Veterans of Am., 106 S.Ct. at 2714 (airlines are not subject to section 504 by virtue of FAA regulation)
 
 
 [9]
 For example, that added clause prohibits the FCC from discriminating against the handicapped in awarding licenses and in hiring employees, and requires that it make FCC facilities accessible to the handicapped. See 2 F.C.C. Rcd at 2203, 2205-07 (adopting 47 C.F.R. Secs. 1.1830(b)(6), 1.1840, 1.1850-1851)
 
 
 [10]
 See Enforcement of Nondiscrimination on the Basis of Handicap in Federally Conducted Programs, 49 Fed.Reg. 35724, 35725, 35735 (Dep't of Justice 1984) (under Sec. 39.130(b)(6), section 504 regulations do not apply to "the programs or activities of entities that are licensed or certified by the agency"). Twenty-one other federal agencies later adopted similar regulations based on the Justice Department prototypes. See Enforcement of Nondiscrimination on the Basis of Handicap in Federally Conducted Programs, 51 Fed.Reg. 22880, 22884, 22898 (1986). Pursuant to section 504, the Justice prototypes and the other agencies' regulations were submitted to the authorizing congressional committees, which registered no objection to them. 49 Fed.Reg. at 35724; 51 Fed.Reg. at 22880
 
 
 [11]
 See, e.g., Captioning for the Deaf, 63 F.C.C.2d 378, 389 (1976) (reserving Line 21 of the television broadcast signal vertical blanking interval for captioned information); Transmission of Teletext by TV Stations, FCC No. 83-120, 53 Rad.Reg.2d (P & F) 1309, 1328 (1983) (approving teletext transmission and preserving portion of signal for closed captioning), reconsideration denied, 101 F.C.C.2d 827 (1985), aff'd in part and rev'd in part on other grounds sub nom. Telecommunications Research & Action Center v. FCC, 801 F.2d 501 (D.C.Cir.1986), cert. denied, --- U.S. ----, 107 S.Ct. 3196, 96 L.Ed.2d 684 (1987); 47 C.F.R. Sec. 73.682(a)(22) (1986) (reserving Line 21 for closed captioning system)
 
 
 [12]
 Appellants argue that the FCC has abandoned a prior policy that the extent of a broadcaster's captioning is relevant to license renewal without supplying a reasoned analysis justifying the change. See Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 57, 103 S.Ct. 2856, 2874, 77 L.Ed.2d 443 (1983); Office of Communication of United Church of Christ v. FCC, 707 F.2d 1413, 1438-43 (D.C.Cir.1983). This argument was not made before the FCC and we therefore need not consider it. Washington Ass'n for Television & Children v. FCC, 712 F.2d 677, 680-83 (D.C.Cir.1983); 47 U.S.C. Sec. 405 (1982)
 Nonetheless, we note that there has been no change in the FCC's policy toward captioning. In 1970, for example, the FCC issued a public notice that it considered captioning a major concern, and that it would "observe developments in this area in the near future, and if the situation does not develop satisfactorily, it may be necessary to begin rule making looking toward the adoption of minimum requirements." The Use of Telecasts to Inform and Alert Viewers with Impaired Hearing, 26 F.C.C.2d 917, 918-19 (1970). At the same time, however, the Commission stated:
 We wish to emphasize that it is the responsibility of each licensee to determine how it can most effectively meet the needs of its viewers. We have not adopted and do not propose definite rules on this subject, and this Public Notice is advisory in nature.
 Id. at 918. In reserving a portion of the broadcast signal for closed captioning, the FCC "[made] it absolutely clear to the public and to the licensees that our decision herein does not make captioning obligatory.... [I]t is still the responsibility of each licensee to determine how it can most effectively meet [the] needs [of hearing-impaired viewers]." Captioning for the Deaf, 63 F.C.C.2d at 389.
 In responding to appellants' 1977 petition to deny, the FCC reiterated that "[t]here is no requirement that any television licensee--commercial or non-commercial--provide open or closed captioning...." 69 F.C.C.2d at 455. In denying reconsideration, the FCC restated once again its long-standing policy:
 [W]e are satisfied that important advances are being made toward achieving the goals which petitioners espouse and which we share--namely, the access of the aurally handicapped to the medium of television.... [I]f at a later date it is demonstrated that the project is not successful in making television programming more available and enjoyable to the hearing impaired, then it may be necessary for the Commission to determine if a rule-making is warranted to ensure that the hearing impaired are not deprived of the benefits of television.
 
 
 [72]
 F.C.C.2d at 281
 
 
 [13]
 Aside from the legal insufficiency of appellants' claims, they also failed to raise any factual question deserving an administrative hearing. In No. 86-1321, appellants' sole affidavit was from Abraham Gottfried, husband of and counsel for appellant Sue Gottfried, and was first filed with the petition for reconsideration. See App., No. 86-1321, at 120-26. Not only was that evidence untimely under 47 C.F.R. Sec. 1.106(c) (1986), it also lacked any solid foundation for the allegations made therein and relied on incomplete TV Guide listings that contradicted many of the affidavit's claims. In No. 86-1105, appellants provided no affidavits at all, leading the chief of the Video Services division to dismiss CAPH's petition for failure to raise a substantial and material factual issue. He nonetheless considered it as an informal objection and reached the merits of the petition. App., No. 86-1105, at 5
 
 
 [14]
 Similarly, in February 1980 CAPH and others petitioned the FCC for a rulemaking on the extension of FCC policies facilitating minority ownership of broadcast stations to the handicapped. The FCC denied the petition because it concluded that the Rehabilitation Act did not require such programs. Moreover, it determined that such programs for the handicapped would not "address the First Amendment concern with diversity of program service viewpoints" to the same degree as had the programs covering racial or ethnic minorities. Paralyzed Veterans of Am., FCC No. 85-651, 59 Rad.Reg.2d (P & F) 1353, 1354 (Dec. 16, 1985), petition for review dismissed as untimely, CAPH v. FCC, 833 F.2d 1333 (9th Cir.1987)