

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-30-2004

# Three Rivers Center v. Housing Auth Pgh

Precedential or Non-Precedential: Precedential

Docket No. 03-4356

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

## Recommended Citation

"Three Rivers Center v. Housing Auth Pgh" (2004). *2004 Decisions*. Paper 346.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/346

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF
APPEALS FOR THE THIRD CIRCUIT

No. 03-4356

THREE RIVERS CENTER FOR
INDEPENDENT LIVING, INC.; DANA
WASHINGTON, on behalf of herself
and all others similarly situated,

Appellants

v.

HOUSING AUTHORITY OF THE
CITY OF PITTSBURGH; KEITH
KINARD, in his official capacity as the
Executive Director of the HOUSING
AUTHORITY OF THE CITY OF
PITTSBURGH

On Appeal from the United States
District Court for the Western District of
Pennsylvania
(Dist. Court No. 02-cv-01069)
District Judge: Hon. Terrence F.
McVerry

Argued: May 12, 2004

Before: NYGAARD, MCKEE and
CHERTOFF, Circuit Judges

(Filed: August 30, 2004)

Stephen F. Gold (Argued)
125 South Ninth Street, Suite 700
Philadelphia, PA 19107

Mark J. Murphy
Robin Resnick
Disabilities Law Project
1315 Walnut Street, Suite 400
Philadelphia, PA 19107-4798

David Kahne
P.O. Box 66386
Houston, TX 77266

Paul O'Hanlon
Disabilities Law Project
1901 Law & Finance Building
429 Fourth Avenue
Pittsburgh, PA 15219-1505

*Counsel for Appellants*

Susan A. Yohe (Argued)
Buchanan Ingersoll P.C.
One Oxford Centre
310 Grant Street, 20th Floor
Pittsburgh, PA 15219-1410

*Counsel for Appellee*

OPINION OF THE COURT

CHERTOFF, Circuit Judge

This is a suit seeking declaratory

and injunctive relief compelling the Housing Authority of the City of Pittsburgh to comply with regulations the Department of Housing and Urban Development promulgated pursuant to Section 504 of the Rehabilitation Act. The regulations require the Pittsburgh Housing Authority to effect certain systemic reforms in order to provide accessible public housing to handicapped individuals. They require, among other things, that five percent of the dwelling units in any newly constructed public housing project be accessible to persons with ambulatory disabilities and an additional two percent of the units be accessible to persons with hearing or vision impairments.

The Housing Authority—and this appears to be undisputed—has continually failed to comply with HUD's regulations. Plaintiffs allege that, as a result, the Pittsburgh Housing Authority has denied accessible housing to disabled individuals. As troubling as this may be, however, our task here is to determine whether appellants may properly maintain a suit to enforce the HUD regulations, by way of either a private right of action under the Rehabilitation Act or under Section 1983. There are certainly steps HUD itself can and should take to effect compliance. But the District Court partially dismissed appellants' complaint because it determined that they did not have a private right of action to enforce the HUD regulations.

Our analysis requires a careful review and discussion of the law governing when private parties can sue to enforce a legislative or regulatory mandate. For the following reasons, we will affirm the denial of a right of action to enforce the regulations.

I.

Section 504 of the Rehabilitation Act of 1973 is commonly referred to as the "civil rights bill of the disabled," ADAPT v. Skinner, 881 F.2d 1184, 1187 (3d Cir. 1989) (en banc), or the "cornerstone of the civil rights movement of the mobility-impaired." Id. at 1205 (Mansmann, J., concurring in part and dissenting in part). Generally, the statute "prohibits any program or activity receiving federal funds from discriminating against persons with disabilities." Bowers v. National Collegiate Athletic Ass'n, 346 F.3d 402, 432 (3d Cir. 2003). It provides:

> No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 U.S.C. § 794(a).[1]

HUD promulgated regulations to effectuate Section 504 in 1988. The provisions that address accessibility in public housing projects and facilities appear among the regulations at 24 C.F.R. §§ 8.20-33.

When a public housing authority that receives federal funds constructs new housing or "substantially alters" existing housing,[2] the HUD regulations require that five percent of the dwelling units in those facilities be accessible to persons with mobility disabilities and two percent be accessible to persons with hearing or vision impairments. See 24 C.F.R. §§ 8.22(a)-(b), 8.23(a). When one or more dwelling units in an existing facility are altered—but the alterations do not rise to the level of "substantial alterations"—the units must be made accessible to the mobility impaired, until five percent of the units in the facility are accessible. See 24

C.F.R. § 8.23(b)(1).[3]

In addition, accessible dwelling units must, to the "maximum extent feasible," be distributed throughout projects. 24 C.F.R. § 8.26. And they must "be available in a sufficient range of sizes and amenities so that a qualified individual with handicaps' choice of living arrangements is, as a whole, comparable to that of other persons eligible for housing assistance under the same program." Id.

Because the Pittsburgh Housing Authority receives federal funding through HUD, it is subject to Section 504's requirements. The Housing Authority has altered existing facilities and built new ones since the time the HUD regulations went into effect, but it failed to satisfy the obligations the regulations impose.[4]

---

[1] The Rehabilitation Act's other provisions serve similar ends. Section 501 prohibits employment discrimination based on disability by federal agencies. See 29 U.S.C. § 791. Section 503 prohibits employment discrimination by federal contractors and grantees. See 29 U.S.C. § 793.

[2] "Substantial alterations" are alterations that cost 75% or more than the replacement cost of the completed facility. 24 C.F.R. § 8.23(a).

[3] The regulations allow HUD, upon request, to prescribe a higher percentage or number than the regulations addressing newly-constructed and altered housing require, "based upon demonstration to the reasonable satisfaction of HUD of a need for a higher percentage or number, based on census data or other available current data . . . or in response to evidence of a need for a higher percentage or number received in any other manner." 24 C.F.R. §§ 8.22(c), 8.23(b)(2).

[4] Since this case reaches us upon the District Court's disposition of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), we relate the facts as set forth in plaintiffs' complaint.

As a consequence of the Housing Authority's failure to comply with the HUD regulations, the demand for accessible public housing in Pittsburgh exceeds the supply. Indeed, in 1995 the Housing Authority signed a "Voluntary Compliance Agreement" with HUD acknowledging "compliance deficiencies" and "civil rights deficiencies." It conceded the need for at least 546 accessible rental units, and it promised to provide them. In return, HUD agreed to continue to provide the Housing Authority with federal funding. By the Housing Authority's own admission, however, there were only 200 units accessible to people in wheelchairs as of March 2002.

As a result, when Dana Washington applied for public housing in 2001, the Housing Authority assigned her to a unit with stairs even though she suffers from near-paralysis of her lower left limb and must use a wheelchair. When Washington complained about the assignment, the Housing Authority re-assigned her to another unit. But again the sink and bathtub in the newly-assigned unit were inaccessible to Washington.

Similarly, Three Rivers Center for Independent Living, Inc. ("Three Rivers")—a non-profit corporation that advocates for the rights of individuals with disabilities—reports that many of its clients have a hard time finding accessible and affordable housing.[5] Consequently,

Three Rivers expends considerable effort assisting people with disabilities in trying to locate accessible housing.

In June of 2002, Washington and Three Rivers filed the present suit against the Pittsburgh Housing Authority and its Executive Director, Keith Kinard, in his official capacity. They seek an order declaring the Pittsburgh Housing Authority in violation of the HUD regulations and enjoining the Housing Authority to comply with them.[6] Specifically, plaintiffs seek to

---

[5] Three Rivers is a federally-funded entity that is statutorily required to, inter alia, promote "equal access of individuals with significant disabilities to society and to all services, programs, activities, resources, and facilities, whether public or private and regardless of the funding source." 29 U.S.C. § 796f-4(b)(1)(D).

[6] In their complaint, plaintiffs sought to represent a class of "all people with disabilities who currently, or in the future, will live in public housing [maintained by the Pittsburgh Housing Authority] that is not accessible . . . as well as all people with disabilities who currently are, or in the future, will be, on the waiting list for . . . public housing." App. 12. The docket entries from the District Court indicate that although plaintiffs moved for class certification and the issue was briefed, the parties filed a joint motion asking the District Court to "hold in abeyance Certification Activities." App. 5. The District Court granted the motion and as a result it never ruled on the motion for class certification. We therefore treat the present suit as an

4

enforce four requirements: (1) that a specific percentage of newly constructed public housing be accessible to the disabled, see 24 C.F.R. § 8.22(a)-(b); (2) that a specific percentage of substantially-altered public housing be accessible to the disabled, see 24 C.F.R. § 8.23(a); (3) that altered (but not substantially altered) public housing be made accessible until at least five percent of the units are accessible, see 24 C.F.R. § 8.23(b)(1); and (4) that accessible housing be distributed throughout projects and comparable to housing available to non-disabled individuals, see 24 C.F.R. § 8.26.[7]

Defendants moved to dismiss

_____

individual action brought by Washington and Three Rivers.

[7] In their complaint, appellants based their claims on other portions of the HUD regulations—specifically, 24 C.F.R. § 8.24(a) (addressing accessibility requirements in existing, non-altered housing), 24 C.F.R. § 8.25(c) (requiring housing authorities to promulgate and implement a "needs assessment" and "transition plan"), and 24 C.F.R. § 8.27(a) (requiring housing authorities to make disabled persons aware that accessible units are available and ensure that accessible units are utilized by disabled persons to the fullest extent possible). See App. 18-19. Appellants appear to no longer seek enforcement of these regulations. See Appellants' Br. 7-9. We therefore only address the regulations appellants pursue on appeal.

plaintiffs' complaint "to the extent that it seeks relief for the violations of regulations promulgated by [HUD] to implement § 504 of the Rehabilitation Act." App. 25. They argued that plaintiffs did not have a private right of action to enforce the regulations because the regulations "are too far removed from Congressional intent as reflected in § 504 to constitute 'federal rights' privately enforceable under either § 504 or § 1983." App. 26-27. The District Court granted defendants' motion, relying largely on our opinion in South Camden Citizens in Action v. New Jersey Dep't of Envtl. Prot., 274 F.3d 771 (3d Cir. 2001), cert. denied, 536 U.S. 939 (2002) and the Supreme Court's decision in Alexander v. Sandoval, 532 U.S. 275 (2001). Plaintiffs timely appealed.[8]

II.

The District Court, which exercised its jurisdiction under 28 U.S.C. §§ 1331 and 1343, did not dismiss plaintiffs' complaint in its entirety. Rather, it dismissed the complaint only insofar as plaintiffs sought to enforce the HUD regulations. The Court was of the opinion, however, that the partial dismissal involved a controlling question of law as to which there is substantial ground for difference of opinion—namely, "[w]hether

_____

[8] As we explain below, plaintiffs' individual claims that the Housing Authority denied them their right to access under Section 504 still remain before the District Court.

5

Plaintiffs have a private right of action against Defendants for enforcement of regulations of the United States Department of Housing and Urban Development . . . as set forth in 24 C.F.R. §§ 8.20-33 which mandate the number and distribution of accessible housing units for qualified handicapped individuals in publicly funded housing developments," App. 42—and that an immediate appeal may materially advance the ultimate termination of the litigation. We therefore exercise jurisdiction under 28 U.S.C. § 1292(b).

We review *de novo* the District Court's dismissal under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. See, e.g., Pinker v. Roche Holdings Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002). "In evaluating the propriety of dismissal, we accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." Id.

A.

Although we affirm the District Court's judgment, we do so based on reasoning that differs somewhat from the District Court's. We begin with three general propositions. First, Congress may effect its legislative goals through various means. "Congress sometimes legislates by innuendo," for example, "making declarations of policy and indicating a preference while requiring measures that, though falling short of legislating its goals,

serve as a nudge in the preferred directions." Rosado v. Wyman, 397 U.S. 397, 413 (1970), quoted in Pennhurst State Sch. & Hosp. v. Halderman, 451 U.S. 1, 19 (1981). Other times, Congress more specifically creates "rights and obligations." Pennhurst, 451 U.S. at 15.

Second, Congress can create various types of rights and obligations. See, e.g., Granfinanciera, S.A. v. Nordberg, 492 U.S. 33, 51-52 & n.8 (1989) (distinguishing between "public rights" and "private rights" for purposes of the Seventh Amendment's right to trial by jury). And one subset of rights that courts have discerned in statutes is "personal rights."[9] Personal rights inhere in the individual; they are "individually focused"; they create "individual entitlements." Non-personal rights, by contrast, often have a "systemwide" or "aggregate" focus; are defined in terms of obligations of the person or entity regulated rather than in terms of entitlements of the individual protected; are "not concerned with whether the needs of any particular person have been

---

[9] Courts have been inconsistent in the terms they use to refer to "personal rights," sometimes calling them "individual rights," "private rights," or simply "federal rights." We use the term "personal rights" throughout this opinion to maintain the demarcation between "personal rights" and "private rights of action." See Gonzaga Univ. v. Doe, 536 U.S. 273, 285 (2002) (using the term "personal rights").

6

satisfied"; and regard "institutional policy and practice, not individual instances" of conduct. See Gonzaga Univ. v. Doe, 536 U.S. 273, 282, 288 (2002); Sandoval, 532 U.S. at 288-89; Blessing v. Freestone, 520 U.S. 329, 343-44 (1997).

To be sure, systemic legislation may in fact benefit a group of individuals. That does not mean that the legislation confers a personal right on those individuals. "[T]he question whether a statute is *intended* to *benefit* particular plaintiffs is quite different from the question whether the statute *in fact benefits* those plaintiffs . . . ." Pa. Pharmacists Ass'n v. Houstoun, 283 F.3d 531, 535 (3d Cir. 2002) (en banc). Personal rights are those intentionally and "unambiguously conferred" through "rights-creating" language. Gonzaga, 536 U.S. at 283, 284; see Sabree ex rel. Sabree v. Richman, 367 F.3d 180, 187-88 (3d Cir. 2004).

Third, even when Congress creates rights or obligations (including personal rights), it does not necessarily follow that private parties can enforce them or obtain a direct remedy through the judicial process. Id. at 284. It is often the case that only the executive can enforce a federal statute. Some statutes create rights in individuals that are only enforceable by agencies, see, e.g., Communications Workers of America v. Beck, 487 U.S. 735, 742 (1988), or not enforceable at all, see Alden v. Maine, 527 U.S. 706 (1999).

Of course, there are also many statutorily created rights and obligations that private parties may seek to enforce in judicial proceedings. Congress may expressly provide in a particular statute, for example, that a party can bring suit seeking enforcement. Determining whether a statute explicitly provides a private remedy involves a relatively straightforward inquiry. A court must look to the text of the statute to see if it states, by its terms, that a private party may bring suit to enforce it. See Hallstrom v. Tillamook County, 493 U.S. 20, 25 (1989).

Congress explicitly provided a private remedy in Title II of the Civil Rights Act of 1964, for instance, a statute that prohibits discrimination in places of public accommodation on the basis of "race, color, religion, or national origin." 42 U.S.C. § 2000a. Title II provides that when someone has or is about to contravene its prohibition against discrimination, "a civil action for preventive relief, including an application for a permanent or temporary injunction, restraining order, or other order, may be instituted by the person aggrieved." 42 U.S.C. § 2000a-3(a). Similarly, many environmental statutes contain express private rights of action. See Hallstrom, 493 U.S. at 23 n.1 (citing statutes).

Indeed, when Congress authorizes an express right of action, it can choose to allow private parties to enforce a range of rights and obligations that Congress creates. Some statutes create personal rights, for example, and provide that private parties may bring suit to enforce those personal rights. See, e.g., 42 U.S.C. §§ 2000e-2(a)(1), 2000e-5(f)(1) (Title VII of the Civil Rights Act of 1964). Other

statutes create rights or obligations that do not constitute personal rights—or impose obligations in addition to personal rights—and still expressly allow private parties to enforce those rights or obligations. See, e.g., 33 U.S.C. §§ 1365(a), (g) (Clean Water Act). Indeed, some statutes create private rights of action—often called "citizen suit provisions"—that extend plaintiffs' capacity to bring suit to the bounds of Article III standing. See Friends of Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc., 528 U.S. 167 (2000) (Clean Water Act).

Congress may also circumscribe a private right of action that it creates. It may limit, for example, the type of relief available to a plaintiff. Compare 42 U.S.C. § 2000a-3(a) (limiting remedies available for violations of Title II of the Civil Rights Act of 1964 to injunctive relief) with 42 U.S.C. § 2000e-5(g) (injunctions available to remedy violations of Title VII) and 42 U.S.C. § 1981a(a)(1) (damages available to remedy violations of Title VII). Similarly, Congress may create a private right of action that allows plaintiffs only to enforce a limited set of the rights or obligations that a statute creates. See Olmsted v. Pruce Life Ins. Co. of N.J., 283 F.3d 429, 433 (2d Cir. 2002) (observing that in the Investment Company Act of 1940 Congress explicitly provided a private right of action to enforce some provisions of the statute but not others). All this goes to saying that not all private rights of action are created equally; Congress may (and does) tailor rights of action to suit various purposes and goals.

Many statutes, however, do not contain provisions addressing either whether private parties may maintain a right of action or the scope of a right of action a private party may maintain. When that is the case, courts may still recognize a private right of action in one or both of two ways. First, a court may find an implied right of action in the statute. Second, Section 1983 may provide a private right of action.[10] These are separate yet overlapping inquiries. See Gonzaga, 536 U.S. at 283-84; W. Va. Univ. Hosps., Inc. v. Casey, 885 F.2d 11,

---

[10] Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

8

18 n.1 (3d Cir. 1989).

Congress's intent in enacting a statute is always the "focal point" in determining whether courts should infer a private right of action from the statute. Thompson v. Thompson, 484 U.S. 174, 179 (1988). The four factors set forth in Cort v. Ash, 422 U.S. 66 (1975) guide a court's review in discerning that intent. Thompson, 484 U.S. at 179; see also Hindes v. F.D.I.C., 137 F.3d 148, 169 (3d Cir. 1998). Those factors are:

> First, is the plaintiff "one of the class for whose *especial* benefit the statute was enacted,"—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? [Fourth,] is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

Cort v. Ash, 422 U.S. at 78 (citations omitted) (emphasis in original). "The first

two criteria are critical. If they do not point toward a private right, the remaining two 'cannot by themselves be a basis for implying a right of action.'" Am. Tel. & Tel. Co. v. M/V Cape Fear, 967 F.2d 864, 866 (3d Cir. 1992) (quoting Touche Ross & Co. v. Redington, 442 U.S. 560, 580 (1979) (Brennan, J., concurring)). Put succinctly, for an implied right of action to exist, a statute must manifest Congress's intent to create (1) a personal right, and (2) a private remedy. See Sandoval, 532 U.S. at 286.

Determining whether there is a private right of action under Section 1983 to enforce a federal statute requires only a slightly different analysis. Section 1983 by its terms, of course, furnishes a private remedy.[11] The threshold question remains, however, whether the federal statute creates a personal right—i.e., a plaintiff must show that "the statute creates 'enforceable rights, privileges, or immunities within the meaning of § 1983.'" Pa. Pharmacists Ass'n v. Houstoun, 283 F.3d at 535 (quoting

---

[11] Thus the second prong of Cort v. Ash—whether the statute manifests Congress's intent to create a private remedy, which is critical to implication analysis—is irrelevant to the analysis under Section 1983: "Plaintiffs suing under § 1983 do not have the burden of showing an intent to create a private remedy because § 1983 generally supplies a remedy for the vindication of rights secured by federal statutes." Gonzaga, 536 U.S. at 284.

9

Wright v. Roanoke Redevelopment & Housing Auth., 479 U.S. 418, 423 (1987)). Once the plaintiff establishes "the existence of a federal right," there arises a rebuttable presumption that the right is enforceable through the remedy of § 1983. Pa. Pharmacists Ass'n v. Houstoun, 283 F.3d at 535. This presumption may be rebutted by showing that "Congress specifically foreclosed a remedy under § 1983, [either] expressly, by forbidding recourse to § 1983 in the statute itself, or impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." Powell v. Ridge, 189 F.3d 387, 401 (3d Cir. 1999) (internal quotations and citations omitted), quoted in South Camden, 274 F.3d at 780.

Critically, the inquiry whether there is a personal right under implied right of action analysis and the question whether there is a personal "enforceable right" under Section 1983 are the same. As the Supreme Court held in Gonzaga University v. Doe: "[T]he initial [Section 1983] inquiry—determining whether a statute confers any right at all—is no different from the initial inquiry in an implied right of action case, the express purpose of which is to determine whether or not the statute 'confer[s] rights on a particular class of persons.'" 536 U.S. at 285 (quoting California v. Sierra Club, 451 U.S. 287, 294 (1981)). The Court further explained:

> A court's role in discerning whether personal rights exist in the § 1983 context should therefore not differ from its role in discerning whether personal rights exist in the implied right of action context. Both inquiries simply require a determination as to whether or not Congress intended to confer individual rights upon a class of beneficiaries. Accordingly, where the text and structure of a statute provide no indication that Congress intends to create new individual rights, there is no basis for a private suit, whether under § 1983 or under an implied right of action.

Id. at 285-86 (internal citations omitted). Thus Congress's creation of a personal right is necessary to the existence of both an implied right of action and a right of action under Section 1983.

To sum up, private parties may only enforce personal rights through implied rights of action or through Section 1983. This distinguishes implied rights of action and rights of action under Section 1983 from express rights of action. Only under the latter may plaintiffs enforce more than personal rights, when Congress expressly so prescribes. See, e.g., Laidlaw, 528 U.S. at 175-76, 185.

B.

That leads us to the issue of whether a private right of action exists to

10

enforce regulations that an agency promulgates pursuant to a federal statute. Where Congress has created an express right of action, a court must examine the scope of the statute's right of action—as evidenced in the statute's text—to determine whether a plaintiff may maintain a cause of action to enforce the regulations. Congress may, for example, explicitly establish a private right of action to enforce regulations. Thus, the Resource Conservation and Recovery Act of 1976 "permits individuals to commence an action in district court to enforce waste disposal regulations promulgated under the Act." Hallstrom, 493 U.S. at 22.[12]

The inquiry becomes more complicated, however, when a private party seeks to enforce a regulation an agency promulgates pursuant to a statute that does not contain an express right of action; that is, when the statute gives rise to a private remedy either through an implied right of action or through Section 1983.

We addressed whether a plaintiff could bring suit to enforce regulations promulgated under a statute with an implied right of action in Angelastro v. Prudential-Bache Securities, Inc., 764 F.2d 939 (3d Cir. 1985). There, we articulated a three-tiered analysis for determining "whether to imply a private right of action from an [agency] rule, and only indirectly from the enabling statute." Id. at 947. A court must determine "(1) 'whether the agency rule is properly within the scope of the enabling statute'; (2) 'whether the statute under which the rule was promulgated properly permits the implication of a private right of action'; and (3) 'whether implying a private right of action will further the purpose of the enabling statute.'" Polaroid Corp. v. Disney, 862 F.2d 987, 994 (3d Cir. 1988) (quoting Angelastro, 764 F.2d at 947); see also Corestates Trust Fee Litig. v. Corestates Bank, N.A., 39 F.3d 61, 67-68 (3d Cir. 1994) (applying Angelastro).

The Supreme Court subsequently addressed the issue in Alexander v. Sandoval, which involved a regulation that the Department of Justice ("DOJ") had promulgated under Title VI of the Civil Rights Act of 1964. See 532 U.S. at 278. Section 601 of Title VI prohibits recipients of federal funding from intentionally discriminating against individuals based on race, color, or national origin. 42 U.S.C. § 2000d; see also Sandoval, 532 U.S. at 280-81. Section 602 of Title VI authorizes federal agencies "to effectuate the provisions of [Section 601] . . . by issuing rules, regulations, or orders of general applicability." 42 U.S.C. § 2000d-1. The DOJ promulgated a regulation prohibiting recipients of federal funding

---

[12] The statute provides, in relevant part, that "any person may commence a civil action on his own behalf . . . against any person . . . who is alleged to be in violation of any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to this chapter." 42 U.S.C. § 6972(a)(1)(A).

11

from taking actions that had a disparate impact on racial groups. See 28 C.F.R. § 42.104(b)(2) (2000).

Since Section 601 prohibits only intentional discrimination, the Court explained, the DOJ's disparate impact regulation had to derive from Section 602. Thus the plaintiffs did not have a right to sue under Section 601's private right of action; "[t]hat right must come, if at all, from the independent force of § 602." Id. at 286.[13] The Court therefore analyzed Section 602 to determine whether it could infer a right of action under that provision. In doing so, the Court found that Section 602 does not manifest Congress's intent to create a personal right, namely because "rights-creating" language is absent from the statute. Id. at 288. In addition, the Court found that Section 602 does not manifest an intent to create a private remedy, mostly because the enforcement system that Section 602 and Section 603 create suggest just the opposite. Id. at 289-90.

Because no private right of action exists to enforce Section 602, and the DOJ's regulation derived from that provision of Title VI, the plaintiffs in Sandoval did not have a right of action to enforce the regulation. Id. at 290-91. The Court noted, however, that private parties may bring suit to enforce regulations that

---

[13] The Court concluded that it was "beyond dispute" that an implied right of action exists to enforce Section 601. 532 U.S. at 280.

validly construe a statute for which there exists a private right of action. "A Congress that intends the statute to be enforced through a private cause of action intends the authoritative interpretation of the statute to be so enforced as well." Id. at 284. Thus Sandoval is consistent with this court's jurisprudence in Angelastro and its progeny. Angelastro, like Sandoval, teaches that courts must look to the enabling statute to find the source of a right of action to enforce regulations, because "an agency's rulemaking power cannot exceed the authority granted to it by Congress." 764 F.2d at 947. A regulation cannot "conjure up a private cause of action that has not been authorized by Congress. Agencies may play the sorcerer's apprentice but not the sorcerer himself." Sandoval, 532 U.S. at 291.

Sandoval and Gonzaga do allow us to refine our decision in Angelastro. Sandoval and Gonzaga explain in no uncertain terms that Congress's statutory creation of a personal right is a predicate to finding an implied right of action in a statute. The agency and its regulations do not furnish an independent basis to "conjure" an implied right of action. Thus, when determining as a part of Angelastro's private right of action analysis "whether the agency rule is properly within the scope of the enabling statute," a court is really looking more precisely at whether the agency rule is within the scope of—i.e., construes, fleshes out, or fills in the interstices of—a *personal right* that the enabling statute creates.

Sandoval and Angelastro were

12

implied right of action decisions. Therefore, neither addressed whether plaintiffs could enforce the regulations at issue in those cases by way of a private right of action under Section 1983. This court subsequently examined that issue in South Camden Citizens in Action v. New Jersey Dep't of Envtl. Prot., 274 F.3d 771 (3d Cir. 2001), cert. denied, 536 U.S. 939 (2002). There, we considered a disparate impact regulation that the Environmental Protection Agency had promulgated under Section 602 of Title VI. We extended Sandoval's reasoning to the Section 1983 context and concluded that a regulation cannot "create a right enforceable through section 1983 where the alleged right does not appear explicitly in the statute, but only appears in the regulation." Id. at 781. A plaintiff can only enforce a regulation under Section 1983 if the regulation "merely define[s] the specific right that Congress already ha[s] conferred through the statute." Id. at 783. In other words, private parties cannot enforce regulations under Section 1983 when the regulations "do more than define or flesh out the content of a specific right conferred upon the plaintiffs" by the statute and instead "give the statute a scope beyond that Congress contemplated." Id. at 790. Under Section 1983, therefore, regulations give rise to a right of action only insofar as they construe a personal right that a statute creates. Id.; see also Harris v. James 127 F.3d 993, 1008-09 (11th Cir. 1997).

With these principles in mind, we turn to whether plaintiffs here can bring suit to enforce the HUD regulations, either vis-à-vis a right of action under the Rehabilitation Act or Section 1983.

## C.

To determine whether plaintiffs have a private right of action under the Rehabilitation Act to enforce the HUD regulations, we must make a series of inquiries. First, we examine the scope of the private right of action that exists to enforce Section 504. We conclude that since Section 504's private right of action is contiguous with Title VI's—for which an implied, not express, right of action exists—plaintiffs can bring suit to enforce personal rights that Section 504 creates, and only such personal rights.

Second, we examine Section 504 and the pertinent HUD regulations to determine whether the HUD regulations construe any personal right that Section 504 creates. We ultimately conclude that while the HUD regulations we examine here may construe rights or obligations that Section 504 creates, they do not construe *personal rights* that Section 504 creates. We therefore find that the Rehabilitation Act does not provide a private right of action to enforce these particular HUD regulations.

## 1.

The Rehabilitation Act, as originally enacted, did not explicitly provide a private right of action. In the years following its enactment, however, a number of courts (including this Court) concluded that an implied right action existed to enforce the statute. See Lloyd v.

13

Reg'l Transp. Auth., 548 F.2d 1277, 1280-81 (7th Cir. 1977); Kapmeier v. Nyquist, 553 F.2d 296, 299 (2d Cir. 1977) (following Lloyd); United Handicapped Fed'n v. Andre, 558 F.2d 413, 415 (8th Cir. 1977) (following Lloyd); Leary v. Crapsey, 566 F.2d 863, 865 (2d Cir. 1977); Davis v. Southeastern Cmty. Coll., 574 F.2d 1158, 1159 (4th Cir. 1978) (following Lloyd), rev'd on other grounds, 442 U.S. 397 (1979); NAACP v. Med. Ctr., Inc., 599 F.2d 1247, 1258-59 (3d Cir. 1979) (following Lloyd); Kling v. County of Los Angeles, 633 F.2d 876, 878 (9th Cir. 1980) (following Lloyd). Congress's subsequent amendments to the Rehabilitation Act reinforce, indeed compel, the conclusion that a private right of action exists to enforce Section 504.

First, Congress added Section 505(a)(2) to the Rehabilitation Act in 1978. The provision provides that the "remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under section 794 of this title." 29 U.S.C. § 794a(a)(2). At the time, "the courts, including [the Supreme Court], ha[d] unanimously concluded or assumed that a private action may be maintained under Title VI." Regents of Univ. of Cal. v. Bakke, 438 U.S. 265, 419 (1978) (Stevens, J., concurring in part and dissenting in part). As the Supreme Court has explained,

Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change. So too, where, as here, Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute.

Lorillard v. Pons, 434 U.S. 575, 580-81 (1978) (internal citations omitted). Thus Congress, in essence, provided a private right of action under Section 504 by incorporating Title VI's "remedies, procedures, and rights" into the statute. See also Barnes v. Gorman, 536 U.S. 181, 184-85 (2002); Bowers, 346 F.3d at 426 ("[A]lthough the remedy available to persons aggrieved by violations of the Rehabilitation Act . . . is at root an implied one, [the statute], by cross-referencing Title VI, which already had been interpreted as creating a private right of action, arguably [contains an] explicit provision[] creating a private right of action.").

Second, Congress confirmed that a private right of action exists to enforce Section 504 when it ratified the Supreme Court's decision in Cannon v. Univ. of Chicago, 441 U.S. 677 (1979). In Cannon, the Court held that a private right of action exists to enforce Title IX of the Education Amendments of 1972, because Title IX

14

"was patterned after Title VI" and "[i]n 1972 when Title IX was enacted, the [parallel] language in Title VI had already been construed as creating a private remedy." Id. at 694, 696. Like Title IX, Section 504 was also patterned after Title VI. See Med. Ctr., Inc., 599 F.2d at 1258. And Congress subsequently enacted Section 1003 of the Rehabilitation Act Amendments of 1986, 42 U.S.C. § 2000d-7, which the Supreme Court has interpreted as "a validation of Cannon's holding." Franklin v. Gwinnett County Pub. Sch., 503 U.S. 60, 72 (1992); see also Sandoval, 532 U.S. at 280.[14]

We note these circumstances not because the parties dispute whether a private right of action exists under Section 504. Rather, we do so because the source of the private right of action speaks to its scope. Section 504's private right of action derives—through Congress's use of parallel language, incorporation of Title VI's remedies in the 1978 amendments, and ratification of Cannon— from the right of action that exists to enforce Title VI. Consequently, "the remedies for violations of . . . § 504 of the Rehabilitation Act are coextensive with the remedies available in a private cause of action brought under Title VI." Gorman, 536 U.S. at 185.

The private right of action that exists to enforce Title VI is, of course, an implied right of action. See Sandoval, 532 U.S. at 280; Bowers, 346 F.3d at 428 n.21; Med. Ctr., Inc., 599 F.2d at 1257-58. Since, as we have explained, Sandoval mandates that an implied right of action can exist only where Congress creates a personal right, a plaintiff can enforce only personal rights through an implied right of action. Because Section 504's remedies—including the scope of its private right of action—are coextensive with Title VI's, it follows that plaintiffs can only bring suit to enforce personal rights that Section 504 creates.

Accordingly we conclude that insofar as plaintiffs seek to enforce these HUD regulations, they may do so only if the regulations construe and define a personal right that Section 504 creates; "[a]gencies may play the sorcerer's apprentice but not the sorcerer himself." Sandoval, 532 U.S. at 291. We turn to the relationship between Section 504 and the HUD regulations at issue.

2.

The Supreme Court has interpreted Section 504 in two principal decisions: Southeastern Cmty. Coll. v. Davis, 442 U.S. 397 (1979) and Alexander v. Choate, 469 U.S. 287 (1985). In Davis and Choate, the Court articulated two countervailing legislative concerns that underlie Section 504 and guide courts' interpretation of it: "(1) effectuation of the statute's objectives of assisting the handicapped; and (2) the need to impose

---

[14] Section 1003 "abrogated the States' Eleventh Amendment immunity under Title IX, Title VI, § 504 of the Rehabilitation Act of 1973, and the Age Discrimination Act of 1975." Franklin, 503 U.S. at 72.

15

reasonable boundaries in accomplishing this purpose." Skinner, 881 F.2d at 1191 (citing Choate, 469 U.S. at 299). The Court struck a balance between these consideration by reading Section 504 as requiring federal fund grantees to offer "meaningful access" to programs they administer. Meaningful access, as explicated by the Court, does not require that grantees "fundamentally alter" or "substantially change" the nature of the program. Moreover, grantees need not make accommodations that would impose undue financial or administrative burdens. See Skinner, 881 F.2d at 1192; Nathanson v. Med. Coll. of Pa., 926 F.2d 1368, 1383 (3d Cir. 1991). "Choate and Davis therefore contemplate a continuum in which some modest modifications may be necessary to avoid discrimination but other more substantial modifications are not required by section 504." Skinner, 881 F.2d at 1192.

Despite courts' efforts to interpret Section 504 and determine what it requires of federal grantees, the statute is nonetheless still "'ambiguous and lacking in specifics.'" Disabled in Action of Pa. v. Sykes, 833 F.2d 1113, 1117 (3d Cir. 1987) (quoting R.I. Handicapped Action Comm. v. R.I. Public Transit Auth., 718 F.2d 490, 494 (1st Cir. 1983)); see also Skinner, 881 F.2d at 1193 (referring to the "difficulty in determining precisely the extent of accommodation mandated by section 504"). As a result, some courts have "suggested that the relevant federal agency and not the court has the chief responsibility to determine what Section 504 requires of recipients of federal funds in accommodating the needs of disabled persons." Sykes, 833 F.2d at 1117.

Section 504 does not, by its terms, mandate the issuance of regulations to implement the statute. See Helen L. v. Didario, 46 F.3d 325, 330 n.9 (3d Cir. 1995). Section 504's legislative history indicates, however, that Congress contemplated the promulgation of such regulations. See S. Rep. No. 93-1297, at 40 (1974), reprinted in 1974 U.S.C.C.A.N. 6390-91; see also Cmty. Television of S. Cal. v. Gottfried, 459 U.S. 498, 509 (1983) ("[S]ince § 504 was patterned after Title VI of the Civil Rights Act of 1964, it was understood that responsibility for enforcing it, insofar as it regulated private recipients of federal funds, would lie with those agencies administering the federal financial assistance programs.").

In 1976, President Ford issued Executive Order No. 11,914, 41 Fed. Reg. 17,871 (Apr. 28, 1976), which required the Department of Health, Education, and Welfare ("HEW") to "establish . . . guidelines for determining what are discriminatory practices, within the meaning of section 504." HEW issued "coordination regulations" in 1978. See 43 Fed. Reg. 2132 (Jan. 13, 1978).

The HEW regulations now appear at 28 C.F.R. Pt. 41.[15] After providing

---

[15] HEW eventually became the Department of Health and Human Services ("HHS"), see 20 U.S.C. § 3508 (1979), and in 1980 President Carter transferred

some general prescriptions against discrimination in federally funded programs and activities, see 28 C.F.R. § 41.51, the regulations specifically address employment discrimination and program accessibility. See C.F.R. §§ 41.52-58.[16]

The program accessibility regulations provide: "No qualified handicapped person shall, because a recipient's facilities are inaccessible to or unusable by handicapped persons, be denied the benefits of, be excluded from participation in, or otherwise be subjected to discrimination under any program or activity that receives or benefits from federal financial assistance." 28 C.F.R. §

_____

HHS's coordination and enforcement authority to the Attorney General. See Executive Order No. 12,250, 45 Fed. Reg. 72,995 (Nov. 2, 1980). The DOJ thereafter adopted the HEW coordination regulations without substantive changes. See Bragdon, 524 U.S. at 633. For the sake of internal consistency, we refer to the regulations as the "HEW regulations."

[16] Thus the regulations reflect the concerns that motivated Congress to enact Section 504. See Choate, 469 U.S. at 306-07 ("In enacting the Rehabilitation Act and in subsequent amendments, Congress . . . focus[ed] on several substantive areas—employment, education, and the elimination of physical barriers to access—in which it considered the societal and personal costs of refusals to provide meaningful access to the handicapped to be particularly high.").

41.56. The regulations' more specific program accessibility requirements go on to distinguish between existing, newly-constructed, and altered facilities.

With respect to new construction, the regulations require that new facilities "be designed and constructed to be readily accessible to and usable by handicapped persons." 28 CFR § 41.58(a). And "[a]lterations to existing facilities [must], to the maximum extent feasible, be designed and constructed to be readily accessible to and usable by handicapped persons." Id.

After HEW promulgated its regulations, Congress amended Section 504. As we described above, Congress enacted Section 505(a)(2) and incorporated by reference Title VI's "remedies, procedures, and rights." 29 U.S.C. § 794a(a)(2). Congress also added text to Section 504 requiring federal agencies to "promulgate such regulations as may be necessary to carry out the amendments to this section made by the Rehabilitation, Comprehensive Services, and Developmental Disabilities Act of 1978." 29 U.S.C. § 794.

The Supreme Court has interpreted the 1978 amendments as "ma[king] explicit" Congress's theretofore implicit understanding that agencies administering federal financial assistance programs would enforce Section 504 by promulgating regulations. Gottfried, 459 U.S. at 509. The Court has also interpreted the amendments as "incorporat[ing] the substance of the

[HEW] regulations into the statute." Consol. Rail Corp. v. Darrone, 465 U.S. 624, 634 n.15 (1984).[17] As the Supreme Court has repeatedly noted, the HEW regulations deserve considerable deference because they constitute the "contemporaneous regulations issued by the agency responsible for implementing a congressional enactment." Id. at 634; see also Bragdon v. Abbott, 524 U.S. 624, 632 (1998); Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 195 (2002) (same); Chevron U.S.A. Inc. v. Echazabal, 536 U.S. 73, 82 n.4 (2002) (same).

Importantly, the HEW regulations require each agency to "issue, after notice and opportunity for comment, a regulation to implement section 504 with respect to the programs and activities to which it provides assistance." 28 C.F.R. § 41.4(a); see also 28 C.F.R. § 41.4(c)(2). HUD promulgated Section 504 regulations, which we described above, in 1988.

That brings us to the question on which this appeal hinges: What is the precise relationship between the right of action under Section 504 and the HUD regulations? There is a universe of three possibilities. First, the regulations may do no more than construe personal rights that Section 504 creates. Second, the regulations may (instead or additionally) construe non-personal rights or obligations that Section 504 creates. Third, the regulations may also create distinct rights or obligations—either personal or non-personal—in addition to those that Section 504 creates.[18] As we have explained, only in the first instance would plaintiffs have a private right of action to enforce the regulations. That is because Section 504's right of action only allows plaintiffs to enforce personal rights that the statute creates, and any regulations

---

[17] As the Court explained, "the responsible congressional committees participated in their formulation, and both these committees and Congress itself endorsed the regulations in their final form." Darrone, 465 U.S. at 634.

[18] We distinguish—as we did in South Camden—between regulations that "construe" a statute and regulations that "create rights or obligations in addition to those that the statute creates." If Congress duly authorizes an agency, it may promulgate both types of regulations. See 1 Richard J. Pierce, Jr., Administrative Law Treatise § 6.4, at 325-26 (4th ed. 2002); see also Chao v. Rothermel, 327 F.3d 223, 227 (3d Cir. 2003) (discussing "interpretative" and "legislative" rules); Am. Mining Cong. v. Mine Safety & Health Admin., 995 F.2d 1106, 1108-09 (D.C. Cir. 1993) (same). Appellees assume that Congress has so authorized HUD under the Rehabilitation Act and that the HUD regulations are valid. We adopt that assumption for the purposes of this decision. Nothing here is meant to cast doubt on the validity of the HUD regulations themselves. But the validity of the regulations is a different question than whether they are privately enforceable. See South Camden, 274 F.3d at 787.

18

a plaintiff seeks to enforce must merely "flesh out" those statutory personal rights. Cf. South Camden, 274 F.3d at 790.

An analysis of the HUD regulations here reveals that in any event they do not articulate *personal* rights.

At the outset, we observe that as a general matter the HUD regulations are directed at the Housing Authority's obligations as a grantee. Section 8.22, for example, requires that new housing projects "shall be designed and constructed to be readily accessible to and usable by individuals with handicaps." 24 C.F.R. § 8.22(a). This mandate is not couched in terms of any beneficiary's entitlement, but aims at the fund recipient's conduct. Id. The regulations, to the extent they effectuate Section 504, speak to the regulated state entity and do not focus on the individual beneficiary. Words "that focus on the person regulated rather than individuals protected create 'no implication of an intent to confer rights on a particular class of persons.'" Sandoval, 532 U.S. at 289 (quoting California v. Sierra Club, 451 U.S. 287, 294 (1981)). Thus the regulations fall short of the type of individually-focused entitlement that the Supreme Court has found critical in determining whether Congress created personal rights. See Gonzaga, 536 U.S. at 287; Richman, 367 F.3d at 187-88.

Equally important, the HUD regulations plaintiffs seek to enforce relate to "institutional policy and practice, not individual instances" of discrimination. Gonzaga, 536 U.S. at 288. So, for instance, Section 8.22 provides that new housing projects "shall be designed and constructed to be readily accessible " to handicapped persons. 24 C.F.R. § 8.22(a). And Section 8.26 requires that accessible dwelling units "be distributed throughout projects." 24 C.F.R. § 8.26.

Similarly, the HUD rules have an "'aggregate focus'" and "are not concerned with 'whether the needs of any particular person have been satisfied.'" Gonzaga, 536 U.S. at 288 (quoting Blessing, 520 U.S. at 343, 344). In this regard, we emphasize that all but one of the regulations plaintiffs seek to enforce turn on the percentage of units that meet accessibility requirements. Five percent of the units in newly-constructed and substantially-altered housing projects must be accessible to those with ambulatory disabilities, and two percent must be accessible to those with hearing and visual disabilities. See 24 U.S.C. §§ 8.22(b), 8.23(a). And when the Housing Authority alters a unit, but not substantially, it must make the unit accessible unless five percent of the units in the housing project are already accessible. See 24 U.S.C. § 8.23(b).

Thus the Housing Authority can fail to comply with the regulations and still not deny access to a disabled individual. Consider, for instance, if the Housing Authority were to build a new 100-unit housing facility and, although none of the newly-built units were accessible to the mobility impaired, the Housing Authority had a policy of retrofitting every unit to be accessible whenever an impaired

individual sought public housing. The Housing Authority would provide accessible housing to disabled individuals, yet it would have failed to comply with the regulations. We do not offer this example to suggest that Section 504 does not authorize the prophylactic measures the regulations articulate. Rather, the example demonstrates that the mandates the regulations set forth are not individual-oriented and have a systemwide focus. See Blessing, 520 U.S. at 343-44 (treating focus on systemwide compliance as inconsistent with the creation of personal rights).

Since the HUD regulations at issue do not articulate personal rights, they of course cannot *construe* personal rights that Section 504 creates; and whether the HUD regulations otherwise construe general obligations that Section 504 creates or create distinct obligations is not dispositive for private right of action analysis. Thus, although we assume that the HUD regulations properly effectuate Section 504, we cannot conclude that the regulations construe a personal right within Section 504. As a result, plaintiffs cannot enforce the regulations by way of Section 504's private right of action.

In reaching our conclusion, we note that while Sandoval drives our decision, this case differs from Sandoval. In Sandoval, plaintiffs could not sue to enforce the disparate impact regulations because no private right of action existed at all to enforce the statutory provision (Section 602 of Title VI) from which the regulations derived. Here, a right of action

does exist to enforce the regulations' enabling statute (Section 504). But the right of action that exists under Section 504 only allows plaintiffs to enforce personal rights that Section 504 creates. And the HUD regulations do not construe a personal right under Section 504.

Similarly, this case also differs from recent cases applying Sandoval. In Jackson v. Birmingham Board of Education, 309 F.3d 1333 (11th Cir. 2002), cert. granted, 124 S. Ct. 2834 (2004) and Peters v. Jenney, 327 F.3d 307 (4th Cir. 2003) the Eleventh and Fourth Circuits addressed whether plaintiffs had a right of action to enforce anti-retaliation regulations that agencies promulgated under Section 601 of Title VI and the parallel provision in Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681. The issue in those cases was not whether the anti-retaliation regulations articulated personal rights. Rather, the issue was whether the regulation articulated a personal right that Congress created in Title VI and Title IX, respectively. This is the very type of question raised in Sandoval itself. The Fourth Circuit held that the regulations' "retaliation prohibition is an interpretation of § 601's core antidiscrimination mandate." 327 F.3d at 316. The Eleventh Circuit, in contrast, held that "[b]ecause Congress has not created a right through Title IX to redress harms resulting from retaliation, [the Department of Education's regulation] may not be read to create one either." 309 F.3d at 1346.

Our case is far different because it

20

involves regulations implementing systemic rights and obligations. Whether the HUD regulations construe Section 504 (or create new obligations), Section 504's implied right of action only allows plaintiffs to enforce personal rights that the statute creates and not systemic obligations. Thus, even if we were to assume that Congress created the systemic rights and obligations that the HUD regulations articulate, plaintiffs may not enforce those rights under Section 504 because they are not personal rights.

Finally, our decision is consistent with past cases in which plaintiffs have enforced regulations promulgated under statutes (including Section 504) that did not contain express rights of action. In Disabled in Action of Pa. v. Sykes, 833 F.2d 1113 (3d Cir. 1987), for example, we granted summary judgment to plaintiffs seeking to enforce Department of Transportation regulations promulgated under Section 504. The regulations required grantees to make transportation facilities—in Sykes, a particular subway station in Philadelphia—accessible when a facility is substantially altered. Id. at 1119. Those regulations required the City of Philadelphia to make a common area individually accessible; that is, an area that any disabled individual had to access in order to use the public facility. Thus the regulations construed plaintiffs' personal right to access. See also Chaffin v. Kan. State Fair Bd., 348 F.3d 850, 858 (10th Cir. 2003) (finding cause of action to enforce regulations promulgated under Title II of the ADA). That is entirely in accord with our decision here.

D.

The reasons that compel us to conclude that plaintiffs cannot maintain their suit to enforce the HUD regulations as a private cause of action under Section 504 also compel us to conclude that they cannot sue to enforce the regulations under Section 1983. As we held in South Camden, plaintiffs can only enforce under Section 1983 personal rights that Congress creates. Whether or not Congress created the systemic rights that the HUD regulations articulate, plaintiffs cannot enforce them under Section 1983 because they are not personal rights.

III.

For the reasons stated above, we will affirm the District Court's judgment. We emphasize, as the defendants concede, see Appellee's Br. 26, 32, that plaintiffs may continue to bring suit to enforce their personal rights to access directly under Section 504. Thus those claims, as well as plaintiffs' motion seeking class certification, remain before the District Court. We note that the District Court will have to determine the extent to which any of the HUD regulations may be relevant to determining whether defendants are liable under Section 504. See, e.g., Nathanson, 926 F.2d at 1386. Moreover, if plaintiffs continue to seek class certification as well as injunctive relief, the Court will have to address several inter-connected issues over the course of the proceedings. See Armstrong v. Davis, 275 F.3d 849, 860 (9th Cir. 2001) ("[W]here a district court

21

grants system-wide injunctive relief, the issues of standing, class certification, and the propriety and scope of relief are often intermingled."). Finally, HUD retains its independent authority—indeed, its independent obligation—to enforce its own regulations after many years of the Housing Authority's noncompliance.